MaddeN, Judge,
delivered the opinion of the court:
The plaintiff is a New York corporation organized in 1894. It has no capital stock, corporate shares, or certificates of ownership of any kind. It had a net income during the tax years 1945 through 1950, except the year 1947. It was taxed upon that income, and seeks to recover the taxes paid, on the ground that it was exempted from taxation by section 101 (7) of the Internal Revenue Code of 1939, which says:
Sec. 101. Exemptions from Tax on. Corporations. • The following organizations shall be exempt from taxation under this chapter—
(7) Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which- inures to the benefit of any private shareholder or individual;
The purposes of the plaintiff, as stated in its certificate of incorporation are:
The investigating, ascertaining and keeping of a rec-r ord of the pedigree of horses, and of instituting, maintaining, controlling and publishing a Stud Boole or Book of Registry of horses in the United States of America and Canada; and of promoting and holding exhibitions of such horses and generally for the purpose of improving the breed thereof.
*789 The impetus for the formation of the plaintiff was furnished by the owners and breeders of thoroughbred race horses in the United States. In 1893 a group of them adopted a resolution proposing the formation of a Jockey Club of 50 members to encourage the development of the thoroughbred horse and to establish racing on a footing commanding public confidence and interest. They contemplated that the organization would establish a firm authority over all racing which might come within its control, punish offenders against accepted racing rules, protect the interest of the public in racing, and dispense justice in respect to all questions pertaining to racing which might affect the welfare of the associations racing under the rules of the proposed organization.
The organization was formed and has carried out its proj ected purposes, as our detailed findings show. Its Registration Department maintains and publishes the American Stud Book, in which breeders can learn the blood lines of every thoroughbred registered in the United States. Strict proof of eligibility to be registered in the Stud Book is required. More than 8,000 foals are now registered each year. The book is indispensable to the breeding and racing of ■ thoroughbred horses in the United States.
The plaintiff publishes monthly the Racing Calendar which gives information about the names of horses, assumed names, partnerships, arrangements for the leasing of horses, jockey contracts, and registered colors. It conducts, without charge, a school for training and improving the quality of -officials who supervise race meetings throughout the United States.
The plaintiff has adopted and promulgated rules of racing, which are accepted as the basic rules, and have been adopted wherever racing is conducted. They are designed to insure orderly racing, to prevent participation in racing by persons of questionable character and to eliminate deception and confusion. They deal with every feature of the arrangements necessary for the conduct of racing.
The plaintiff investigates the behavior of jockeys, keeps records of rulings against them for careless and fraudulent practices and other misconduct and, if necessary, takes dis *790 ciplinary action against them and against owners and trainers. During the tax years here in question, the plaintiff passed upon applications of owners, trainers and jockeys for licenses, investigating their character and responsibility, and in proper instances, took disciplinary action against them. Such disciplinary measures taken by the plaintiff were recognized by all jurisdictions where racing takes place, both in the United States and abroad. The plaintiff’s records are consulted by racing authorities throughout the United States.
The statutes of the State of New York provide that one of the three stewards required for each racing meet shall be appointed by the plaintiff, and empower the plaintiff to license owners, trainers and jockeys in that State and to revoke such licenses for cause.
The plaintiff’s by-laws provide for a membership of 50 persons, each of whom shall be interested in the breeding and racing of thoroughbred horses. Membership is not transferable. In the years in question, 35 or 36 of the members owned breeding farms, and, all, with possibly one exception, owned or raced thoroughbred horse9. The plaintiff’s affairs are managed by nine stewards, elected for two-year terms. They receive no compensation. It has the usual corporate officers of whom only the Executive Secretary receives a salary. He is not a steward or a member of the plaintiff. There are some 22 employees.
The plaintiff has a rented office in New York City and a breeding farm at Avon, New York. It has no club house, restaurant, bar or other facilities for entertainment. Stallions, some of which belong to members of the plaintiff, are kept at the breeding farm. Nominal stallion fees are charged but the farm does not make a profit.
The plaintiff’s income is derived from initiation fees of $200, and annual dues of $200 from each member, stallion fees, registration and license fees, proceeds from the sale of the American Stud Book and Racing Calendar, and compensation paid by five New York race tracks and one race track in Delaware for the supervision of race meetings. In each of four of the five years here in question the plaintiff had a net income of more than $60,000. Its surplus, which had *791 been accumulated since 1894, was $730,243.78 at the end of 1950. Except for some payments to charities, its income is used, or held, for its corporate purposes. It has in contemplation new activities within its corporate field which would require large expenditures.
The plaintiff claims that it is a “business league”, within the meaning of section 101 (7) of the Internal Revenue Code of 1939, which we have quoted above, and that its income is exempted from taxation by that statute. The statute does not define business leagues, but an indication of what Congress intended by the expression may be gathered from the fact that they are named along with chambers of commerce, real estate boards, or boards of trade. Section 29.101 (7)-l of Regulations 111 (26 C. F. R.), promulgated by the Commissioner of Internal Revenue says:
A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. * * *
The plaintiff offers no objection to the regulation but insists that it fits the definition. We think the plaintiff is “an association of persons having some common business interest, the purpose of which is to promote such common interest * * But we think the plaintiff does not comply with the regulation as a whole, because (1) it engages in a regular business of a kind ordinarily carried on for profit and (2) because one of its principal activities and sources of income is “the performance of particular services for individual persons.”
The publication of the Stud Book and the Racing Calendar are activities of a sort which, if the plaintiff did not cover the field, would quite certainly be undertaken by some one as a business activity with a view to making a profit. The breeding and racing of thoroughbred horses is, no doubt to a considerable degree due to the plaintiff’s activities and its *792 integrity, big business. Publications carefully prepared, and necessary or interesting to those engaged in the business would sell, just as do the innumerable trade publications presently on the market.
The services which the plaintiff performs for individual persons, other than “racing commissions” and the fees charged therefor, are shown in finding 48. Each of these services is, by the tradition of the industry or even by law, essential to the individual who requests and pays for the services. They are comparable to a lawyer’s certificate of title, or a doctor’s certificate of health. The “racing commissions” charges of $300 per day, which the plaintiff received from five tracks in New York and one in Delaware, were for services described in the contracts as follows:
Because of your long experience, your records and your means of preventing frauds and other acts detrimental to the best interests of racing, we desire to retain you to advise us in respect to the conduct of our 1951 race meeting, and particularly to assist us in safeguarding our race meeting and facilities against anything which would be harmful or detrimental to racing.
. These services were bought and paid for by the tracks so that the races would be orderly and reputable, and spectators and bettors would continue to patronize them, to the profit of the owners of the tracks, the horses, and the betting concessions. We think that these services sold to particular enterprises, which sales produced practically all of the plaintiff’s large income, disqualify it for the tax exemption granted by section 101 (7) of the regulations. Its petition will, therefore, be dismissed.
It is so ordered.
Laramore, Judge; Whitaker, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized in 1894, pursuant to an act of the legislature of the State of New York passed *793 April 20,1891, entitled “An Act to provide for the formation of Corporations for improving the breeds of domestic animals,” which enactment has since been superseded by laws subsequently passed and embodied in what is known as the Membership Corporations Law of the State of New York. At all relevant times it has had its principal office at 250 Park Avenue, New York, New York.
2. A committee, appointed at a special meeting of owners of race horses, met on December 27, 1893, and adopted the following resolution:
It is proposed at the instance and at the request of a large number of the Owners and Breeders in the United States that a Jockey Club be formed with a roll of, say, fifty.
Its purpose to be,, not only to encourage the development of the thoroughbred horse, but to establish racing on such a footing that it may command the interest as well as the confidence and favorable opinion of the public.
That this club shall be formed with a membership as above stated, which is to include the present members of the Board of Control, or such of them as may be in accord with the purposes and objects which the proposed new organization is intended to accomplish, viz: •
First: To establish a firm authority over all racing' upon all the Association’s courses which may come under its. control.
Second: To punish offenders against accepted racing laws.
Third: To protect the interests of the public and thereby insure its confidence and support.
Fourth: To maintain and dispense exact justice in respect to all questions pertaining to racing, or the inter--ests of racing, which may affect the welfare of the associations which may race under the rules of this proposed organization and which are incident to the ownership of the properties.
The original of the above-quoted resolution has been in the continuous custody of The Jockey Club since 1942.
3. The particular objects and purposes of the plaintiff as set forth in its Certificate of Incorporation are “the investigating, ascertaining and keeping a record of the pedigree of horses, and of instituting, maintaining, controlling and publishing a Stud Booh or Book of Registry of horses in the *794 United' States of America and Canada.; and of promoting and bolding exhibitions of such horses and generally for the purpose of improvmg the breed thereof.”
4. The plaintiff has no capital stock, corporate shares or certificates of ownership of any kind.
5. During the years 1945 through 1950 its membership was limited to 50 persons.
6. For the years 1945 through 1950, about 35 or 36 of the 50 members owned thoroughbred breeding farms. With the possible exception of one member, all of the members during that period of years had at one time or another owned or raced thoroughbred horses.
7. The bylaws of the plaintiff in effect during the years 1945 through 1950 provided for the election of members by the membership.
8. Memberships in the plaintiff are not transferable.
9. Each candidate for membership in The Jockey Club must be proposed and seconded by members of the club before he can be elected to membership. All members are required to pay the specified dues. The qualifications for membership are that the candidate be a person of high’ standards and character and that he be interested in the breeding and racing of horses.
10. The initiation fee payable by each member on his election is $200 and the annual subscription of members is $200 a year. The dues were raised from $100 in 1926, when plaintiff moved to 250 Park Avenue.
11. The affairs of the plaintiff are managed by nine stewards who determine all matters pertaining to racing. Their powers and duties are set forth in the Pules of Pacing promulgated by The Jockey Club. These are listed as follows in the index to the Pules of Pacing:
Stewards of the Jockey Club, have power to—
act on undecided cases of Stewards
appoint and approve officials
approve camera for photographic finishes
approve contracts of jockeys and employers
approve or disapprove names
approve starting gate
authorize acceptance of entry after time for closing
authorize transfer of entries in event of death
change course
*795 consent to appeal from decisions of Stewards
fine employers of unlicensed trainers or jockeys
fix penalty where none specified
grant and revoke licenses
grant and revoke amateur riders licenses
grant and withdraw approval of meetings
grant permission to change names
grant permission to handicapper to rectify omission through error
grant permission to register horses after November 1
grant registration of foreign horses
hear appeals of prevented employment
hear and decide cases on appeal
increase punishments and fines of Stewards
inquire into and deal with any matter relating to racing
modify, change or remit fines or penalties
punish or rule off
punish or rule off for employing persons without written discharge
refer appeals to general meeting
refuse entries and transfers
rule off defaulting purchasers
rule off for fraudulent claim
rule off for intimidation or collusion
sanction meetings
settle disputes pertaining to racing colors
suspend and revoke licenses
vary rules to conform with conditions outside New York State
have charge of forfeit list and registrations
have free access to all parts of racing plant
joint session, powers of
must be satisfied as to identity and age of foreign horse
The Board of Stewards of plaintiff corresponds to the board of directors of a business corporation. The stewards receive no compensation nor do the members, but money is provided for a fund to reimburse members for travel expenses. There is no evidence, however, that any member has ever been reimbursed from this fund for travel expenses incurred by him.
12. Stewards are elected by ballot for terms of two years.
13. The officers of the plaintiff consist of a Chairman of the Board of Stewards, a Yice Chairman, a Secretary, a Treasurer and an Executive Secretary and Assistant Treasurer. The only salaried officer is the executive secretary, *796 who actively supervises all the departments of plaintiff and receives $12,000 a year. . He is not a steward or a member of The Jockey Club.
In addition to the performance of his duties for plaintiff* the executive secretary also serves as one of three officials designated as stewards of race meetings held in the State of New York. Pursuant to- a law of the State of New York, one of the stewards for the meeting is appointed by The Jockey Club, one by the State Racing Commission, and one by the-association holding the race meeting. The steward appointed by The Jockey Club is its executive secretary. For his services as a steward of a race meeting, he is paid by the racing association, and his total annual compensation, received from the several race track associations in New York amounts to approximately $40,000. per year. The-duties of the three stewards appointed as above described are to supervise the racing, including the hearing of any complaints.
14. Plaintiff employs about 22 persons of whom 7 are employed in the general office, 11 in its registration department, and 4 at its breeding bureau.
15. Plaintiff does not own any club house or any real estate except its breeding bureau at Avon, New York. Its office-at 250 Park Avenue is rented by it and is equipped with desks, typewriters, file cabinets, etc. Its office includes space-for its executive secretary and staff, its registration department, and a large reading room or library containing racing-records, which is open, without charge, to members of the-public interested in horse breeding and racing. The plaintiff does not have a restaurant or bar or club rooms or facilities for entertainment. It has the use of a room at each of the race tracks in New York without charge for rental. The’ executive secretary of the plaintiff has an office in these rooms. Plaintiff does not have dances or parties but has had a Christmas dimier for its membership.
The stewards of The Jockey Club hold meetings whenever-business justifies it and they hold considerably more than. 12 meetings a year. At those meetings applications to register foals and foreign importations, and applications for-naming of colts and changing of names are granted or re~ *797 jeeted. The problems of the stud book are determined and all matters which have to do generally with racing such as the. promulgation of the rules of racing, approval of the appointment of officials, reviewing cases of malpractices in breeding or registration are subjects for discussion and determination at the meetings of the stewards of The Jockey Club.
16. During the years 1945 through 1950 a statute of the State of New York provided that every license for the conduct of a race meeting must contain a condition that the meeting shall be subject to the reasonable rules and regulations from time to time prescribed by The Jockey Club, a corporation organized under the laws of the State of New York.
Rule 1 of the Rules of Racing promulgated by The Jockey Club provides as follows:
1. A recognized meeting is:
(a) A meeting held with the sanction of the Stewards of The Jockey Club in that portion of the United States over which The Jockey Club exercises jurisdiction. _
_ (b) A meeting held in other portions of the United States, or in any foreign country, with the sanction of any turf authority whose jurisdiction over racing of any nature is recognized by The Jockey Club and which gives effect to sentences imposed by The Jockey Club upon those guilty of fraudulent turf practices.
Rule 84, bearing the caption “Powers of the Stewards of the Jockey Club”, provides in part as follows:
(a) The Stewards of The Jockey Club shall have power, at their discretion, to grant licenses to Owners, Trainers and Jockeys and to such other persons, exercising their occupations or employed at race meetings as the State Racing Commission may determine to require a license from The Jockey Club and, when a member of the State Racing Commission is in attendance, they may revoke such licenses. Every such license issued by The Jockey Club shall provide that the licensee shall comply with the Rules and Regulations of the Commission and these Rules of Racing, and that violation thereof may be punished by fine, suspension of the privileges accorded thereby, or revocation of the license. No license shall be issued by said Stewards to a person shown to the satisfaction of said Stewards to be engaged, *798 or to have been engaged in practices detrimental to the best interests of racing, including bookmaking or pool-selling, or to anyone so shown to be, or to have been, connected with any such person in any such practice, provided that in cases in which the Stewards shall find that such occupation or connection has ceased for a sufficiently long period of time, they may, in their discretion, issue such license. Nor shall a license be issued by said Stewards to a person so shown to be undesirable or financially irresponsible or otherwise unqualified.
*{• Sfc
(c) The Stewards of The Jockey Club have power, at their discretion, to grant and to withdraw the approval of The Jockey Club to Associations in the conduct of meetings.
17. During the years 1945 through 1950 a statute of the State of New York provided that for the purpose of maintaining a proper control over race meetings, the plaintiff should license owners, trainers and jockeys at running races.
As already indicated in finding 13, a statute of the State of New York in effect during the same time provided for the appointment of three stewards to supervise each race meeting, one of whom was to be appointed by the State Racing Commission, one by The Jockey Club, and one by the association conducting the race meeting.
18. During the years 1945 through 1950 plaintiff investigated the behavior of jockeys, reviewed and kept records of rulings against them for careless and fraudulent practices and general misconduct, and took disciplinary measures against some of them. During the same years, the plaintiff considered the applications of owners for licenses and in. some cases refused such applications, because of the general character or financial responsibility of the applicant, because of his association with undesirable characters, or because he had been engaged in bookmaking; plaintiff also took disciplinary action against some trainers for various reasons such as the fact that horses trained by them had been found to have been stimulated or depressed.
19. During the years 1945 through 1950 running races were required to be conducted in accordance with the Rules of Racing promulgated by plaintiff. These rules require (with minor exceptions) that horses be registered with it in order *799 to race; they require that before racing the horse bear a name approved and allowed by The Jockey Club; they require that partnerships, leases and other agreements for the racing of horses, as well as assumed names in which a person or persons may wish to race, be approved by and filed with The Jockey Club; they require jockeys’ contracts to be approved by and filed with it; they require that racing colors be approved by and filed with it. These rules are designed to permit orderly racing, to prevent participation in racing by persons of questionable character and to prevent deception or confusion.
20. Plaintiff’s rules of racing are the basic rules of racing which have been adopted in the various States throughout the United States in which racing is conducted. The racing commission in each State has the right to make its own rules but they follow largely the plaintiff’s rules of racing. The National Association of State Racing Commissioners, constituting the commissioners of all States in which racing is conducted, invites plaintiff to send a representative to consult with them in their deliberations, and they have expressed commendation of the services of plaintiff. Disciplinary measures taken by The Jockey Club against jockeys, trainers and owners are recognized by all jurisdictions both in the United States and abroad.
21. Plaintiff has originated and participated in the establishment of systems for identifying horses in order, for example, to prevent “ringing” (fraudulent substitution in a race of one horse for another).
22. Plaintiff has extensive records, including those sent to it from different States of the United States and from other countries, relating, among other things, to persons whose character qualifications to participate in the breeding and racing of thoroughbred horses are questionable. Its records are accurate and are often used by official racing bodies of New York and other States as a source of information. Plaintiff is frequently consulted, without charge, by the New York State Racing Commission and the racing authorities of other States.
23'. Since 1897 plaintiff has kept the American Stud Book, which records thoroughbred horses and their pedigrees. *800 Breeders can there determine the blood lines of every thoroughbred registered in the United States and see the advantages gained from crossing of blood lines. The stable owner is primarily interested in acquiring horses that have successful blood lines and the only place they can search for that information is in the American Stud Book. Before recording therein strict proof of eligibility is required. The number of foals registered has increased annually so that now over 8,000 foals are registered each year. The number of foals registered by The Jockey Club in 1950 was 8,255, which was an all-time high. It also obtains for its records the stud books of other countries from which horses may be imported into the United States and for which horses application may be made for registration in the American Stud Book.
24. There is no other publication in the United States like the American Stud Book.
25. Without the American Stud Book it would, be impossible to conduct in the United States the breeding and racing of thoroughbred horses.
26. The reason why only registered thoroughbreds are eligible for racing at authorized race meetings is that they ■have been specially bred for speed, stamina and courage. Other horses cannot successfully compete with them and there are so many horses in the United States that unless entries in authorized race meetings are limited to thoroughbreds it would be practically impossible to have race meetings.
27. The American Stud Book is recognized by the .jockey clubs of England, France, Germany, and Italy.
28. Plaintiff is the liaison between American racing and racing in other countries.
29. Plaintiff publishes monthly and distributes its Bacing Calendar in which is printed information which is available only therein and is important to the businesses of breeding and racing, such as information about races, and colors registered, names of horses, assumed names, partnerships, arrangements for leasing of horses, jockey contracts, and other contracts filed with plaintiff.
30. On its records, the only expenses plaintiff charged against the American Stud Book and the Bacing Calendar were the costs of printing. Although considerable overhead *801 was involved in compiling the material for these publications and in checking numerous entries to avoid mistakes, plaintiff did not undertake to allocate any of such overhead as an item of expense chargeable to the two publications. Had proper allocations of overhead been made during the taxable years involved here, it is reasonably probable that the accounts would have shown that plaintiff realized no profit on the sale of either the American Stud Book or the Racing Calendar.
. 31. Plaintiff instituted and conducts, without charge, a school for training and improving the quality of officials to officiate at thoroughbred race meetings throughout the United States, and such officials are in much demand.
32. Plaintiff maintains at its expense an experimental breeding bureau at Avon, New York, where mares of farmers are served by thoroughbred stallions furnished in part by members of The Jockey Club for the purpose of improving the breed of horses. Foals dropped at this breeding bureau belonged to the owners of the mares rather than to The Jockey Club. Although stallion fees are charged, plaintiff’s net expense for maintaining the breeding bureau during the taxable years in suit ran from a minimum of $7,937.70 in 1945 to a maximum of $16,158.19 in 1949.
33. The breeding and raising of thoroughbred horses are businesses in which millions of dollars are invested. Racing is one of the great spectator sports, being attended by more people in recent years than any other sport.
34. The owners of thoroughbred breeding farms and racing stables, including members of the plaintiff, direct and conduct their operations for the purpose of making a profit.
35. The activities of The Jockey Club are indispensable to the businesses of breeding and racing, including the businesses of its members engaged in breeding or racing or both.
38. The aggregate of the sales prices of yearlings sold at auction by breeders throughout the United States totaled $5,069,303 in 1950. The number of yearlings sold at auction by breeders in the United States was 1,739 in 1950. There were more than 1,200 thoroughbred breeding farms in operation in the United States in 1950. About $400,000,000 is invested in such breeding farms.
*802 37. There are approximately 25,000 thoroughbred horses, valued at nearly $90,000,000, on breeding farms. Of these the 19,000 starting horses are valued at a minimum of $66,500,000. There are 83 thoroughbred race tracks in the United States valued at about $227,000,000. The number of persons employed in the thoroughbred racing industry, in 1950 was approximately 62,000 and their total earnings' were approximately $241,000,000.
38. The aggregate of the purses received each year by owners in the racing of thoroughbred horses throughout the United States increased from $5,375,554 in 1907 to $50,102,-099 in 1950. The aggregate of the purses received in 195b by such owners in New York State was $7,502,910.
39. In 1950 the attendance at thoroughbred race track meetings throughout the United States was 21,845,556. In New York State it was 4,238,542.
40. In 1950 pari-mutuel betting on thoroughbred racing throughout the United States was $1,358,739,248. In New York State in 1950 it was $308,477,512.
41. In 1950 the revenues of the States of the United States from pari-mutuel betting on thoroughbred racing totaled $83,772,287.62. The revenue of the State of New York from thoroughbred racing in 1950 was $20,597,745.60.
42. The activities of The Jockey Club have had a very important effect upon the integrity of racing and the increase of public confidence therein.
43. Increased public confidence in the integrity of racing increases attendance at the race tracks and increases parimutuel betting, which in turn leads to the offering of larger purses, which in turn increases the value of thoroughbred race horses for racing and breeding purposes.
44. During the years 1945 through 1950 the members of plaintiff had a common interest in the breeding and racing of thoroughbred horses.
45. During the years 1945 through 1950 plaintiff’s purpose was to promote the common interest in the breeding and racing of thoroughbred horses, and its activities were directed toward this purpose during those years.
46. As authorized by the Unconsolidated Laws of New York, members of plaintiff are admitted to race courses with *803 out charge. The same is true of owners of horses, stable managers, trainers, members of turf organizations, persons accredited by the press to attend such meetings, public officials engaged in the performance of their duties and other persons whose duties require their presence at the race tracks.
Paragraph 5 of the bylaws of plaintiff provides that the members are entitled to such club rooms and other privileges as may be prescribed from time to time by the Board of Stewards. Plaintiff does not perform particular services for its members, and its requirements, fees, and charges are the same for members as for nonmembers.
Buie 201 of the Buies of Bacing provides in substance that any amateur who wishes to ride in races on even terms with jockeys shall first obtain leave from the stewards of The Jockey Club and pay $25 to the treasurer of The Jockey Club, but members of The Jockey Club and of the National Steeplechase and Hunt Association are exempt from this rule. Although members of plaintiff are granted a special privilege under the rule, there is no evidence that any of the members has ever ridden as an amateur in races on even terms with jockeys.
47. During the taxable years in issue, plaintiff received compensation, which is designated in its financial statements as “racing commissions.” Such compensation was paid plaintiff for services rendered to five New York race tracks and one race track in Delaware and is composed of a per diem fee of $300 per racing day. Plaintiff’s services were performed pursuant to letter contracts written by each of the race tracks to and accepted by plaintiff. Each of these 'contracts read in pertinent part as follows:
Because of your long experience, your records and your means of preventing frauds and other acts detrimental to the best interests of racing, we desire to retain you to advise us in respect to the conduct of our 1951 race meeting, and particularly to assist us in safeguarding our race meeting and facilities against anything which would be harmful or detrimental to racing.
The services furnished by plaintiff included general supervision, investigation of persons engaged in racing, policing the grounds and some legal services. The policing was *804 done by a police patrol furnished by plaintiff and paid for in part .by it.
48. During the years 1945 through 1950 plaintiff’s charges for services (other than “racing commissions” for its services to race tracks), including investigation and approval of applications, were as follows:
For issuing “racing permit” ior imported horse not qualified for registration-§50-200.
For registering a foal (and issuing registration certificate) — before Nov. 1 of the year in which foaled-$5.
For registering a foal (and issuing registration certificate) — thereafter and previous to the Jan. 1 next following its birth-§10.
For registering a foal (and issuing registration certificate) — thereafter and previous to March 1 of its “two-year-old-year” (that is the year beginning Jan. 1 and following the year in which foaled) _ §50.
For naming a horse — before March 1 of “two-year-old-year”_No charge.
For naming a horse — after said March 1— §50.
For changing name of a horse — before • January 1 of “two-year-old-year”_§10.
For changing name of a horse — after said January 1_§100.
For filing partnership agreements, leases and other arrangements for racing of horses_ §1 per horse.
For registering assumed name of person wishing to race under assumed name_§100.
For registering change of assumed name_§100.
For licensing owners, trainers and jockeys- As fixed by State Kac-ing Commission.
For filing a contract between a jockey and • • his employer-$1.
For registering .racing colors — annually— §5.
For registering racing colors — for life-§25.
For copy of American Stud Book (the issue in evidence as Defendant’s Exhibit 1 contains over 1700 pages)_§35.
For Supplements to Stud Book_§10.
For copy of “Bacing Calendar”_35 cents per copy, §4 per year.
*805 49. For the years in controversy, The Jockey Club received income and incurred expenditures as follows:

*806

50. As shown by plaintiff’s exhibit 29, plaintiff’s accumulated surplus at the end of 1950 was $730,243.78 for the period from 1894 through 1950. Plaintiff’s total receipts from dues (including initiation fees) and from income from investments were $767,746.85. Of this amount, $426,700 came from dues (including initiation fees) and $341,046.85 was income from investments.
*807 During 12 of the years between 1894 and 1950, plaintiff sustained losses.
Although there is no breakdown in plaintiff’s records to show the total expenses chargeable per year to any one source of income, the evidence establishes that there was very little expense involved in the collection of dues, initiation fees, and income from investments. About 75 percent of plaintiff’s investments were in Treasury bonds or certificates.
51. With the exception of some payments to charities, all of the earnings of plaintiff are used and held for its purposes and activities.
52. Plaintiff has pending against it.claims of the State of New York for franchise taxes amounting with interest and penalties to approximately $75,000, and claims of the City of New York for general business taxes amounting with interest and penalties to approximately $9,000.
53. Plaintiff’s activities have been and are increasing steadily. In 1953, plaintiff supplied 34 stewards and officials for race meets in various parts of the country, and in 1954 plaintiff had a request to supply a considerably larger number of officials for race meets. In view of the increasing volume of these requests, it appears that it will be necessary for plaintiff to train additional people to serve as racing officials and to incur the expense incident to such training.
54. Plaintiff has seriously considered several new projects and if these are undertaken by it, they will require the expenditure of substantial sums of money. One of these projects involves additional restrictions and requirements for the registration of foals. The operation of this project would require the employment of five crews, consisting of three men per crew working in five zones throughout the country. One member of the crew would be employed to keep statistics on markings on colts and dams and to take statements from attendants who are present at the time dams are served and foaled. Another member of the crew would either brand a foal on the hoof or tattoo its lip with a serial number. The third member of the crew, a photographer, would photograph the “night eyes” or “chestnuts” of the foals. Plaintiff has developed a system of photographing these chestnuts, which are bony growths on the legs of horses, and has found *808 that photographs of the chestnuts are consistently as accurate a method of identification for horses as are fingerprints of human beings. It has been estimated that the cost of this project would exceed $75,000 per year.
Plaintiff also has under consideration a study of the effect of the administration of drugs, vitamins, and hormones to horses, both from the standpoint of whether vitamins and hormones are improper stimulants or depressants which affect a horse’s racing condition, and also from the standpoint of whether the injection of hormones interferes with the breeding process. This is a matter with which breeders and other horsemen are deeply concerned. The cost of this proposed project has not been estimated, but it is apparent that it would be an expensive and extensive research program.
55. As stated in a preceding finding, an important source of plaintiff’s revenue is the per diem paid to it by the various racing associations. Racing in New York was stopped during 1911, and that was one of the years during which plaintiff operated at a loss. If racing should be stopped in the future by a war or other causes, plaintiff’s'revenues would greatly decline. At the same time, it would be necessary for plaintiff to maintain the American Stud Book because, if dropped, it would be very difficult to continue the book again.
56. No distribution of plaintiff’s profits, surplus or other assets has ever been made to members or is in contemplation.
57. There is no provision in plaintiff’s Certificate of Incorporation or in its bylaws for distribution of any of its earnings to members.
58. It is the understanding of all members that no distribution of plaintiff’s profits, surplus or other assets will ever be made either during the existence of the plaintiff or upon its dissolution. After the present tax controversy arose all members of plaintiff adopted unanimously an amendment to the bylaws stating in part as follows:
All existing members by remaining members, and all future members by becoming members, agree that no member, his assignee or legal representatives, ever is to receive, during the existence or upon the dissolution of the Club, any distribution of its profits, surplus or other *809 assets. This by-law is intended to state expressly the understanding which has always existed.
59. On or about March 15, 1946, plaintiff filed its United States income and excess profits tax returns for the year ending December 31, 1945 with the Collector of Internal Eevenue for the Third District of New York, at 110 East 45th Street, New York, New York; and in 1946 paid to said collector the total sum of $21,217.95, as follows: $5,330.74 on March 15; $5,330.74 on June'13; $5,251.98 on September 13; $5,304.49 on December 13.
60. On or about November 8, 1948, the Commissioner of Internal Eevenue and plaintiff entered into an agreement extending to June 30, 1950, the time for assessment of any United States income, excess profits and war profits taxes of the plaintiff for the year ending December 31, 1945.
61. On or about June 15, 1950, plaintiff filed with said Collector of Internal Eevenue for the Third District of New York a claim for refund of said taxes in the sum of $21,-217.95 on the ground that it is exempt from such income and excess profits taxes under section 101, subsections (7) and (8) of the Internal Eevenue Code.
62. Six months had elapsed from the date of filing said claim to the date of the filing of the petition herein and the said Commissioner had not rendered a decision upon said claim at the time of the filing of said petition.
63. On or about January 26, 1952, plaintiff filed an exemption affidavit with the Collector of Internal Eevenue for the Third District of New York claiming exemption from income and excess profits taxes, past, present and future under Section 101, subsection (7), of the Internal Eevenue Code.
64. On or about March 12, 1953, the Commissioner of Internal Eevenue mailed to The Jockey Club a letter ruling that it was and is not exempt from tax under paragraphs (7) and (8) of section 101 of the Internal Eevenue Code or either of them.
65. On or about March 15, 1948, plaintiff filed with the Collector of Internal Eevenue for the Third District of New York its United States income tax return for the year ending December 31, 1947; and in 1948 paid to said Collector the *810 total sum of $36,369.29, in four equal installments on or about March. 15, June 3, September 15, and December 15.
66. On or about June 15, 1950, plaintiff filed with said Collector of Internal Bevenue a claim for refund of said income tax for the year 1947-on the ground that it is exempt from income taxes under section 101, subsections (7) and (8) of the Internal Bevenue Code. On or about March 13, 1952, the Commissioner of Internal Bevenue rejected said claim for refund in its entirety.
67. On or about March 15, 1949, plaintiff filed with the Collector of Internal Bevenue for the Third District of New York its United States income tax return for the year ended December 31, 1948; and in 1949 paid to said collector the total sum of $38,317.84, in four equal installments on or about March 15, June 15, September 15, and December 15.
68. On or about June 15, 1950, plaintiff filed with the Collector of Internal Bevenue for the Third District of New York a claim for refund of said income tax for the year 1948 on the ground that it is exempt from income taxes under section 101, subsections (7) and (8) of the Internal Bevenue Code.
69. On or about March 13, 1952, the Commissioner of Internal Bevenue rejected said claim for refund in its entirety.
70. On or about March 11, 1950, plaintiff filed with the Collector of Internal Bevenue for the Third District of New York its United States income tax return for the year ending December 31, 1949; and in 1950 paid to said collector the total sum of $35,457.47, in four equal installments on or about March 11, June 9, September 7 and December 1.
71. On or about March 29, 1952, plaintiff filed with said Collector of Internal Bevenue a claim for refund of said income tax for the year 1949 on the ground that it is exempt from income taxes under section 101, subsections (7) and (8) of the Internal Bevenue Code.
72. Six months had elapsed from the date of filing of said claim to the date of the filing of the petition herein and the Commissioner had not rendered a decision at the time of the filing of said petition.
73. On or about March 14, 1951, plaintiff filed with the Collector of Internal Bevenue for the Third District of New *811 York its United States income and excess profits tax returns for the year ending December 31, 1950; and in 1951 paid to said collector the total sum of $32,318.28, as follows: $8,079.57 on March 15; $8,079.57 on June 15; $3,231.83 on June 25; $6,463.66 on September 14; $6,463.65 on December 1.4.
74. On or about February 29,1952, plaintiff filed with the Collector of Internal Kevenue for the Third District of New York a claim for refund of said income and excess profits taxes for the year 1950 on the ground that it is exempt from income and excess profits taxes under section 101, subsections (7) and (8) of the Internal Revenue Code.
75. Six months had elapsed from the date of the filing of said claim to the date of the filing of the petition herein and the Commissioner had not rendered a decision at the time of the filing of said petition.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is not entitled to recover and the petition is therefore dismissed.