**MIB, INC., Petitioner, Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellant.**

**No. 83–1505.**

United States Court of Appeals, First Circuit.

Argued Dec. 7, 1983.

Decided May 14, 1984.

Robert S. Pomerance, Atty., Tax Div., Dept. of Justice, Washington, D.C., with whom Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Atty., Tax Div., Dept. of Justice, and Robert A. Bernstein, Atty., Tax Div., Dept. of Justice, Washington, D.C., were on brief, for appellant.

Robert H. Kapp, Washington, D.C., with whom Ronald E. Stauffer, and Hogan & Hartson, Washington, D.C., were on brief, for appellee.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

The issue in this appeal by the Commissioner of Internal Revenue is whether appellee MIB, Inc. ("MIB") was erroneously classified by the United States Tax Court as a tax exempt "business league" under section 501(c)(6) of the Internal Revenue Code, 26 U.S.C. § 501(c)(6).[1] Established as a non-profit corporation by the life insurance industry, MIB provides a data bank and exchange for certain information concerning the health and insurability of people who apply for life insurance. The Com-

---

1. Section 501(c)(6) lists among the organizations exempt from income taxation the following:

> Business leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues ... not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

The IRS regulation which defines this provision is found at 26 C.F.R. § 1.501(c)(6)-1. It provides,

> A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league.... Organizations otherwise exempt from tax under this section are taxable upon their unrelated business income ....

missioner believes that MIB falls outside the Code's definition of a "business league," hence he assessed an income tax deficiency against it in the tax year ending September 30, 1979, for some $1.5 million. In a decision reported at 80 T.C. 438 (1983), the Tax Court overturned the Commissioner, finding no tax due. This appeal resulted. We reverse.

## I.

The facts were largely stipulated.

MIB was organized in 1978 in Delaware as a non-stock, non-profit corporation. Its membership is basically open to all life insurance companies incorporated in the United States or Canada, and most all companies in the United States are members. In 1979, its 732 members wrote 98 percent of the legal reserve life insurance in force in this country. MIB's affairs are managed by a board of directors elected by the member companies. There were nine directors in 1979, four of whom had to be medical officers and all of whom had to be officers of a different member company.

MIB's purposes, as set forth in its certificate of incorporation, include the following:

1. To provide for the exchange on a non-profit basis among the Corporation's member life insurance companies of underwriting information with respect to proposed insureds and insurance claimants in such a manner as may best protect the accuracy and confidential nature of the information so exchanged and the interests with respect thereto of such proposed insureds, claimants and insurers concerned;

2. to aid its members in their consideration, assessment and assignment of prospective insurance risks by making available information which is essential to careful underwriting practices and procedures;

3. to help prevent perpetration of fraud upon its members and their policymakers by proposed insureds and claimants who may omit or seek to conceal facts essential to accurate, proper and reasonable determination of insurance risks;

4. to assist in mortality, morbidity and related studies of value to life insurers and or benefit to the medical profession and general public....

The principal activity carried on by MIB is maintenance of a computerized system for gathering, storing and distributing to members, upon their request, confidential underwriting information—mainly, though not solely, health data. The information MIB gathers and disseminates is obtained exclusively from its member companies. It does not employ its own investigators, examine life insurance applicants, use consumer reporting agencies, or the like. MIB's rules require member companies to submit, at their expense, coded reports of certain types of information furnished by applicants for life insurance. Ninety percent of this consists of "medical impairments," which are, in essence, characteristics of the subject's health or medical history. There are 228 categories of coded medical impairments that may be reported. Full medical histories are not reported to MIB.

Besides medical information, MIB collects other data relevant to insurability, e.g., information showing an applicant's date and place of birth, information pertaining to reckless driving or criminal violations, information showing participation in aviation or hazardous sports activity, and records of alcohol or drug abuse. While the reports do not list the amount of life insurance applied for, they show whether the applicant previously applied for insurance with a face amount in excess of $250,000. The Tax Court found that about 20 percent of all insurance applications reflected impairments or some other type of information that members had to report to MIB.

The confidentiality of the information passed through MIB is strictly preserved, subject to rules and regulations adopted by MIB's board. Members are required to supplement, revise and update incomplete

or incorrect data. When an individual applies for life insurance, the company routinely asks his permission to obtain data pertaining to him from MIB's computerized data file in Boston. Upon receiving permission, the company makes a request to MIB and is then furnished with whatever coded information about the person MIB may have received from its member companies.[2] The identities of the reporting companies are not, however, revealed.

By comparing any data so received from MIB with the applicant's answers to questions in the current insurance application, a company can discover any incomplete or misleading aspects of the application. If the company feels it needs to know more, it may in proper circumstances request further details. MIB will forward such a request to the one or more reporting companies, which may in their discretion respond directly to the requesting company.

With limited exception, MIB's reports do not contain sufficient information for a member to make underwriting decisions. Under MIB's rules, members are expected to establish the insurability of applicants by conducting their own independent investigations.

The main function of the information circulated by MIB is to "alert" members to possible omissions or misstatements in current applications. The Tax Court found that because insurance applicants, as well as insurance agents and brokers, are made aware that insurers exchange information in this manner, MIB "works as a powerful deterrent to fraud and misrepresentation." The court found that the effect of fraud deterrence was felt on an industry-wide basis: since information in applications was more trustworthy, member companies were saved the expense both of further investigations and of the misclassification of risks; and these savings were, at least in part, passed on to policyholders.

Besides storing and retrieving data on particular life insurance applicants, as de-scribed above, MIB carries on one other activity. It participates through the Center for Medico-Actuarial Statistics in studies of the effect on life expectancy of conditions such as obesity and high blood pressure. These studies are made available to the public generally, not only to MIB's own members. However, in 1979, only five of MIB's 250 employees engaged full-time in this work, while 150 clerks and 60 electronic data experts were involved in operating the information exchange. Similarly, in 1979 the Center for Medico-Actuarial Statistics was allocated only $150,000, while the information exchange received around $10 million.

MIB's funds come principally from assessments and fees from member companies. Over $11 million came from that source in 1979. The largest single source of revenues, amounting to $5.3 million, was from so-called "checking charges" imposed by MIB on members based on the number and type of requests each of them made for information from the information exchange. For a standard request, MIB charged members 18 to 27 cents depending on how many requests the member made each month. Requests for detailed or expedited responses cost more, up to $1 extra. MIB received around 18 million information requests from members in the year.

MIB also received an additional $5 million of its 1979 revenue from a "basic assessment" which it made against each of its members, computed in accordance with the amount of insurance the member had in force in a given year.

Funds for support of the Center for Medico-Actuarial Statistics ($150,000 in 1979, see above) were separately derived from a separate charge to members equal to three percent of the basic assessment. MIB also took in $825,000 from assessments imposed on members specifically to maintain its executive offices in Connecticut. (The balance of its receipts, in excess of $1 million, amounted to conceded taxable income stem-

---

2. Some of the members transmit requests to MIB and receive data back from it via comput-ers in their offices; others use the mails.

ming from use of its computers to perform commercial services other than the information exchange.)

The concept of an information exchange goes back to the 1890's when the medical directors of several insurance companies arranged to pool underwriting information. In 1902, the companies arranged for the exchange function to be carried on by an unincorporated association known as the Medical Information Bureau ("the Bureau"). Beginning in the 1940's, the Bureau engaged a division of the Sperry Rand Corporation, known as the Recording & Statistical Company ("R & S"), to set up and operate the information exchange as the Bureau's "servicing agent." Under successive contracts with the Bureau, R & S provided and operated in Boston an up-to-date automated system for entering, filing, editing and distributing information of the type in issue. Included in R & S's functions were "checking services" involving computer searching and retrieval, communications to and from member companies, processing of mail inquiries, and similar activities. R & S received as compensation the amount of its costs plus an agreed-upon margin of profit. Based on projections and recommendations from R & S, the Bureau annually established a schedule of fees and assessments to be paid by its members. These fees and assessments were collected directly from the members by R & S, which then accounted for them to the Bureau. To the extent R & S collected fees and assessments in excess of what it was entitled to retain under its contract with the Bureau, it placed these in a reserve account, to be credited against sums due R & S in future years. Thus the information exchange was essentially "farmed out," on a self-liquidating basis, to R & S.

MIB was incorporated in May of 1978, to replace the Bureau. MIB permitted R & S to run the information exchange for the first several months; but as of July 1, 1978, the operations, equipment and facilities used by R & S to conduct the exchange were transferred to MIB pursuant to an agreement with Sperry Rand. Under this agreement, MIB paid Sperry Rand over $4 million for computer and office equipment and certain leased space; and MIB was permitted to recruit and hire the R & S employees who had previously operated the information exchange. According to MIB's 1979 handbook, "the work formerly done by a commercial service agent is now accomplished by the 300-person staff of the Boston Division" of MIB. The schedule of member fees and assessments used by MIB during 1979 was the same as that promulgated by the Bureau when R & S administered the exchange.

MIB sought recognition as a tax-exempt "business league" under section 501(c)(6) of the Internal Revenue Code in July of 1978. Its predecessor, the unincorporated Bureau, had been so recognized under a 1948 ruling of the Internal Revenue Service based upon 26 U.S.C. § 101(c)(7), an earlier codification of section 501(c)(6).

By a letter dated April 17, 1980, the Commissioner denied MIB's application, stating that its business violated the requirements of the applicable regulation in two respects. First, the conduct of the information exchange constituted a "particular service" to MIB's members; and second, MIB was engaged in the kind of business ordinarily carried on for profit. *See* 26 C.F.R. § 1.501(c)(6)–1, quoted *supra* in note 1. MIB thereupon filed a 1979 income tax return under protest, and the Commissioner treated the net profit of $3,354,253 reported in the return as taxable, assessing a tax and a deficiency of nearly half that amount.

MIB then brought this suit in the Tax Court, and the Tax Court ruled that MIB was a business league. Contrary to the Commissioner, the Tax Court rejected the characterization of MIB as providing particular services for individual members. Rather the Tax Court found that the entire life insurance industry was aided by the reduction of fraud, with any services to members being but incidental to this purpose. The Tax Court also ruled that MIB was not engaged in the kind of business ordinarily carried on for profit. The ab-

sence of actual or foreseeable competition to the unique activities carried on by MIB left the Court with "no basis for concluding that a for-profit business would or could perform" a similar function if MIB were to go out of business. 80 T.C. at 455.

## II.

■ This appeal turns on whether or not MIB fits within the definition of a business league set out in the applicable Treasury regulation in 26 C.F.R. § 1.501(c)(6)–1. *See* note 1, *supra.* It is undisputed that the regulation is binding as a proper exercise of regulatory authority. *National Muffler Dealers Association v. United States,* 440 U.S. 472, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979).

■ We disagree with MIB's contention that in determining whether MIB is a business league we must defer to the Tax Court under the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). It is true the Tax Court labelled as "ultimate findings of fact" its conclusions that MIB was not engaged in a regular for-profit business and did not perform "particular services." But the facts from which the court drew these conclusions were all stipulated. The only issue is how MIB's undisputed activities should be broadly characterized for purposes of the tax regulation. In analogous cases, other appellate courts, including the Supreme Court, have not hesitated to decide upon given facts whether or not business league status obtained. *See, e.g., National Muffler Dealers Association v. United States,* 440 U.S. 472, 99 S.Ct. 1304, 59 L.Ed.2d 519. *Contracting Plumbers Cooperative Restoration Corp. v. United States,* 488 F.2d 684 (2d Cir.), *cert. denied,* 419 U.S. 827, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974); *United States v. Oklahoma City Retailers Association,* 331 F.2d 328 (10th Cir.1964). As we believe the question of MIB's status as a business league is one of law, not fact, we determine it without reference to the clearly erroneous standard of Fed.R.Civ.P. 52(a).

## III.

The first and, we think, dispositive issue is whether, quoting from the regulation (*see* note 1, *supra* ), MIB's activities,

> are directed to the improvement of business conditions of one or more lines of businesses *as distinguished from the performance of particular services for individual persons.*

(Emphasis supplied.) This sentence follows a previous one, reading,

> [A business league] is an organization of the same general class as a chamber of commerce or board of trade.

And both sentences follow the statement that the purpose of a business league is to promote the "common business interest" of the persons comprising its members.

The Commissioner argues that a business league must not only improve the conditions of a line of businesses but must do so in a way different from simply supplying products or services to its individual members.[3] He reads the second part of the key sentence—"*as distinguished from* the performance of particular services for individual persons" (emphasis supplied)—as a dispositive limitation upon the first part of the sentence ("Its activities should be directed to the improvement of business conditions of one or more lines of business

**3.** The Commissioner points to the modus operandi of chambers of commerce and boards of trade as what the regulation contemplates. *See National Muffler Dealers Ass'n v. United States,* 440 U.S. at 484 n. 19, 99 S.Ct. at 1310 n. 19. Such organizations, the Commissioner asserts, are

> distinguished by their semi-public and civic nature, their activities in building trade and commerce in their communities, and the resulting benefits to members and nonmembers alike.

The Commissioner concedes that pursuits which often result in fairly tangible benefits to members such as lobbying, research and promotion of the industry are also appropriate activities for a business league. He draws the line between activities such as these which directly promote the industry as a whole and those which render specific services to individual members.

....."). Since the modus operandi of the information exchange operated by MIB is to perform direct services for its individual members, the Commissioner regards it as largely irrelevant whether MIB's activities can be said also to have a synergistic effect on behalf of the life insurance industry as a whole.

In supporting the Tax Court's contrary view, MIB argues that by reducing the incidence of risk misclassification, the information exchange contributes to the financial soundness of the life insurance industry as a whole, and also saves money for policyholders by keeping premiums lower and by increasing policy dividends. MIB also, it is argued, advances the public's interest in equitable apportionment of insurance costs, and fosters public support for the industry by assuring greater honesty. MIB emphasizes, as did the Tax Court, that the information exchanged cannot normally be used for underwriting purposes— it is fragmentary in form, designed in most circumstances only to alert members to the possibility of fraud, not for general underwriting use. The court found that exchange data only occasionally resulted in the actual detection of fraud. The court concluded that MIB's primary mission was thus deterrence, not detection. In the Tax Court's view, the benefit to any individual member from receipt of information was vastly outweighed by the industry-wide benefit of having the system in place as a deterrent to fraud and misrepresentation.

■ While the matter is close, we believe the Commissioner's position is the correct one. To reach the result it did, the Tax Court had to reject what seems an almost incontrovertible fact—that MIB's activities by their nature consist of rendering particular services for individual member companies. MIB responds to a member's request for information about a named applicant by transmitting whatever information it has about that person to the requesting member, who then uses it as an aid to deciding whether to sell insurance to the applicant. These services obviously benefit the businesses of the individual members to whom rendered. That they also produce, as a kind of spinoff, various indirect and intangible benefits for the insurance industry as a whole does not alter the fact that the rendered services are in form and substance "particular services for individual persons."[4] As the Second Circuit said in *Contracting Plumbers Cooperative Restoration Corp. v. United States*, 488 F.2d 684, 685 (2d Cir.), *cert. denied*, 419 U.S. 827, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974),

> While we believe that taxpayer's activities are totally commendable, we nevertheless find that Congress has imposed certain limitations ... and that taxpayer simply does not qualify.

Other cases have arisen where members of a particular industry or trade have banded together to provide a service which all of them need. In *Evanston-North Shore Board of Realtors v. United States*, 320 F.2d 375, 162 Ct.Cl. 682 (1963), *cert. denied*, 376 U.S. 931, 84 S.Ct. 700, 11 L.Ed.2d 650 (1964), the Court of Claims said that where such an entity's

> service is operated primarily for individual members as a convenience and economy in the conduct of their respective businesses, rather than for the improvement of business conditions within the [industry] generally ... the operation is not an activity warranting an exemption under the statute.

*See also Produce Exchange Stock Clearing Association v. Helvering*, 71 F.2d 142, 143 (2d Cir.1934) (no reason "apparent for exempting an association which serves each member as a convenience or economy in his business"); *Northwestern Jobbers' Credit Bureau v. Commissioner*, 37 F.2d

---

**4.** The Commissioner also points out, correctly we believe, that the mere existence and maintenance of the data bank, by itself, confers no benefit upon the industry. "Only taxpayer's members have access to the data bank, and they are precluded, on pain of expulsion from membership, from conveying the information to anyone else. Fraud is deterred or detected only because the members make their own private use of the information in processing insurance applications in the course of their respective businesses." Commissioner's Brief, p. 10.

880, 883 (8th Cir.1930) (denying exemption where members received services "which are valuable and reasonably necessary to the proper conduct of their business"). More recently, in *Contracting Plumbers*, 488 F.2d at 688, the Second Circuit held that a non-profit cooperative organization of New York City plumbers established to repair trenches and other holes created by member plumbers in city streets was not a business league. There, the taxpayer argued that by filling in the holes, an activity previously carried out (unsatisfactorily) by the city, it created goodwill for all plumbers since the community was no longer subjected to their improperly filled excavations. Still, the court found that the primary purpose was the performance of particular services, emphasizing the exact correspondence between the fees paid by a member and the benefit he received.

■ The courts have not gone so far as to hold that *no* benefit may accrue to members of a business league by virtue of their membership. "[I]t can hardly be supposed that individuals would often join organizations without the expectation of receiving some personal benefits therefrom." *National Leather & Shoe Finders Association v. Commissioner*, 9 T.C. 121, 126 (1947). The ultimate inquiry is whether the association's activities advance the members' interests generally, by virtue of their membership in the industry, or whether they assist members in the pursuit of their individual businesses. Generally, such activities as "educational programs, lobbying activities, and [institutional] advertising services" meet this test without difficulty. *Louisiana Credit Union League v. United States*, 693 F.2d 525, 535–36 (5th Cir.1982) (determining whether taxpayer's activities were "substantially related" to its exempt status under section 501(c)(6)—*see* 26

U.S.C. §§ 511–513). *See also Southern Hardwood Traffic Association v. United States*, 283 F.Supp. 1013, 1016–18 (W.D. Tenn.1968), *aff'd*, 411 F.2d 563 (6th Cir. 1969).

In the present case, MIB faces an uphill battle because its information exchange is developed around responding to individual member requests for data relevant to applicants seeking to buy insurance from that member—a service which helps the member decide whether or not to sell insurance to the applicant, and clearly has commercial benefit to the individual member. While it may be that the availability of such individual services also confers a general benefit upon all members and acts in the collective interest as a deterrent, it remains inescapable that the services being performed are all "particular services for individual persons." Because of this, MIB starts—and, we believe, ends—at the opposite end of the spectrum from the "classical" business leagues mentioned in the regulation, to wit, "a chamber of commerce or a board of trade."[5] The mentioned groups chiefly perform services for members collectively; MIB performs specific services for individual members.

In determining, nonetheless, that MIB did *not* perform "particular services," the Tax Court stressed the industry-wide nature of MIB's service. But while industry-wide participation defeats the inference that some members have been treated specially or given a competitive advantage, it does not resolve the nature of the services received. *Cf. National Muffler Dealers Association v. United States*, 440 U.S. 472, 484 n. 19, 487 n. 23, 99 S.Ct. 1304, 1310 n. 19, 1312 n. 23, 59 L.Ed.2d 519 (1979) (distinguishing "line of business" requirement from rule barring the "perform[ance of]

---

**5.** In *National Muffler Dealers Ass'n v. United States*, 440 U.S. at 480–82, 99 S.Ct. at 1308–09, the Supreme Court traced the genesis, and confirmed the significance, of the sentence in the regulation that a business league "is an organization *of the same general class* as a chamber of commerce or board of trade." (Emphasis supplied.) Reference to these organizations is meant, under the principle of *noscitur a sociis*,

to limit business league classification to organizations which share the same general characteristics. 440 U.S. at 481, 99 S.Ct. at 1309. Prominent among the characteristics of a chamber of commerce or board of trade is their emphasis upon improving trade and commerce by activities which serve businessmen and members of the community *in common,* not individually. *See* 440 U.S. at 478, 99 S.Ct. at 1307.

particular services ... in the fee for service sense"). Neither the Tax Court nor the appellee point to any case holding that industry-wide participation is dispositive.[6]

 The Commissioner contends, and we agree, that a major factor in determining whether services are "particular" is whether they are supported by fees and assessments in "approximate proportion to the benefits received." *Evanston-North Shore Board of Realtors v. United States*, 320 F.2d 375, 378–79, 162 Ct.Cl. 682 (1963). *See also Carolinas Farm & Power Equipment Dealers v. United States*, 699 F.2d 167, 171 (4th Cir.1983); *Contracting Plumbers*, 488 F.2d at 688–89. "When each member contributes in proportion to what he receives, it is a strong indication that the benefits received are not, as plaintiff contends they are, 'inherently group benefits.' " *Evanston-North Shore Board of Realtors*, 320 F.2d at 379. *See also Mertens Federal Income Tax* § 34.20, at 222 ("strong presumption" created). Here over 91 percent of MIB's total dues and assessments were related directly to MIB's principal activity, the information exchange. Of this amount, over half—47 percent of total dues and assessments—was received in direct exchange for information through service charges based upon the number of information requests processed.

The Tax Court discounted this fact for two reasons, both of which we find unpersuasive. First, it pointed out that the remainder of MIB's dues and assessments were based upon member size and sales volume, a common method for business leagues to raise revenue. This analysis fails to undercut the significance of the service charges, however, where, as here, they predominate. Neither the Tax Court

nor the appellee suggest any case upholding business league status where such a large proportion of the organization's services were supported by direct service charges, however the remainder was funded.[7] Moreover, size and sales volume, the basis of the dues, are not unrelated to the number of information requests made, the basis of the service charges. Under the circumstances, the presence of such dues does not defeat the inference of particular services created by the service charges.

The Tax Court's second basis for discounting the fee for the service nature of appellee's operation was to suggest that the "primary benefit"—deterrence—"cannot be quantified and necessarily bears no proportional relation to the service charge." 80 T.C. at 463. Even if this is so, however, we are still left with the fact, found by the Tax Court, that MIB's information exchange "convey[s] tangible benefits upon individual businesses in the industry." *Id.* at 457. Where the direct benefits are "tangible" and the other benefits incapable of accurate measurement, the fact that the organization's principal activity is supported by service charges seems of greater, not lesser, import. *Cf. National Chiropractic Association v. Birmingham*, 96 F.Supp. 874, 882 (N.D.Iowa 1951) (services were "particular" when group benefits were "indirect and intangible at best"). Moreover, we know of no case under the current regulation where business league status has been granted to an entity whose *modus operandi* involves the performing of discrete services for individual members—and at charges substantially tied to those very services. That these services are aimed at enabling members to detect fraud rather than for general underwriting

---

6. Cases cited by the Tax Court are inapposite. In each instance the association provided a variety of services, only some of which were challenged as "particular," while here the challenged "particular" service eclipses all others. In none of the cases, moreover, were services provided on a service-charge basis. *See American Plywood Ass'n v. United States*, 267 F.Supp. 830 (W.D.Wash.1967); *Nat'l Leather & Shoe Finders Ass'n*, 9 T.C. 121; *Associated Industries of Cleveland v. Commissioner*, 7 T.C. 1449 (1946).

7. Appellee suggests that the service charge nature of its operation is sanctioned by *Crooks v. Kansas City Hay Dealers' Ass'n*, 37 F.2d 83 (8th Cir.1929). That case, however, did not address the issue of "particular services" and, indeed, arose before that requirement of the regulation took effect.

purposes does not make them any the less "particular services." And as the Commissioner points out, many of the associations denied business league status for rendering services to members could have made, or did make, creditable showings of a public or industry-wide benefit. *See, e.g., National Muffler Dealers Association v. United States*, 440 U.S. at 487–88, 99 S.Ct. at 1312; *Jockey Club v. United States*, 137 F.Supp. 419, 422, 133 Ct.Cl. 787 (1956).

Here we find the government's analogy to a credit bureau helpful in characterizing the benefit received by MIB's members.[8] *Cf. Evanston-North Shore Board of Realtors*, 320 F.2d at 380 (citing analogy to non-exempt stock or commodity exchange as basis for denying exemption to multiple listing service). In each instance members receive specific items of risk assessment information through an exchange from other members of their industry. In each case fraud is detected and deterred, thereby reducing the cost of goods and services to the public (including the cost of credit in the case of a credit bureau). To be sure, the services of credit bureaus are undoubtedly more complete, but this does not answer the Commissioner's argument that the services here are "particular." As the Commissioner explained upon denying MIB's exemption, without the exchange members would themselves have to check insurance applications for their accuracy. Nothing in the Tax Court's opinion answers that assertion.

Appellee argues that it is entitled to exemption because its services are "virtually identical" to activities approved by the Commissioner in his own published revenue rulings or Tax Court cases publicly acquiesced in by him. It concedes, however, that the Commissioner is not bound by these pronouncements if there is "some rational basis for the difference" in treatment. *United States v. Kaiser*, 363 U.S.·

299, 308, 80 S.Ct. 1204, 1210, 4 L.Ed.2d 1233 (1960) (Frankfurter, J., concurring in the result). *See also Dixon v. United States*, 381 U.S. 68, 79, 85 S.Ct. 1301, 1307, 14 L.Ed.2d 223 (1965). We find the cited cases and rulings in large measure inapposite. *Oregon Casualty Association v. Commissioner*, 37 B.T.A. 340 (1938), *acq.* 1938–1 C.B. 22, involved an association, formed by several insurance companies after they were ordered by their state insurance commissioner to check compliance with the rate schedule fixed by law. While the association achieved this end by operating an information exchange, its purpose was to police its members; it was not designed to assist in the underwriting process. Moreover, it was supported entirely by dues, based upon annual net premiums, without any additional service charge. Rev.Rul. 67–394, 1967–2 C.B. 201 is similarly distinguishable. That ruling involved an association of small loan companies formed in response to a state banking regulation. The association operated an information exchange which shared data concerning the number of small loans already held by each loan applicant. These facts, however, are distinguishable on the basis that the regulation and exchange were designed to protect borrowers, not the lenders. The exchange was established at the instigation of the state. Its use was mandatory for all members. And, it was supported entirely by dues. Other rulings cited by appellee seem to us equally distinguishable.

Appellee also argues that the Commissioner's decision to remove MIB's exemption, then in force for 30 years, lacked "rational justification" since "[t]he Bureau's incorporation in 1978 did no more than effect a change in organizational form; its character, purposes and methods of operation" remaining the same. There is a substantial difference, however, between an association which arranges for the provision of a particular service to its

---

**8.** Credit bureaus have been uniformly denied business league treatment. *Credit Bureau of Greater New York v. Commissioner*, 162 F.2d 7 (2d Cir.1947); *Credit Managers Ass'n of Northern & Central California v. Commissioner*, 148 F.2d 41 (9th Cir.1945).

members by a for-profit entity, with fees paid directly to that entity without apparent rebate to the association, *cf. Louisiana Credit Union League v. United States*, 693 F.2d 525 (5th Cir.1982), and one which provides the service itself for the same fees. After the Bureau's incorporation and absorption of R & S's activities there was little room for doubt that MIB's members received benefits *from it* in direct proportion to the fees paid *to it*.

We conclude that while MIB is undoubtedly an important resource for the entire life insurance industry, it acts by performing particular services for individual members and is not exempt from income tax as a business league.

### IV.

The Commissioner also challenges the Tax Court's conclusion that MIB was not engaged in the kind of business ordinarily carried on for profit. The Commissioner emphasizes MIB's takeover of the for-profit functions of R & S, a division of Sperry Rand. If, in fact, the Commissioner is right, as to which we express no opinion, that would be an independent ground for denying business league status. Because we are satisfied that MIB does not qualify on the "particular service" ground just discussed, we see no need to consider this separate issue.

The decision of the Tax Court is reversed.

*So ordered.*