The JOCKEY CLUB
v.
The UNITED STATES.
No. 197-53.

United States Court of Claims.
Jan. 31, 1956.

**420**

John W. Burke, Jr., Washington, D. C., William T. Pullman and H. C. McCollom, New York City, on the briefs, for plaintiff.

Roger M. Stuart, Jr., Washington, D. C., with whom was H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiff is a New York corporation organized in 1894. It has no capital stock, corporate shares, or certificates of ownership of any kind. It had a net income during the tax years 1945 through 1950, except the year 1947. It was taxed upon that income, and seeks to recover the taxes paid, on the ground that it was exempted from taxation by Section 101 (7) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 101(7), which says:

"§ 101. Exemptions from tax on corporations.

"The following organizations shall be exempt from taxation under this chapter—

\*    \*    \*    \*    \*    \*

"(7) Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual".

The purposes of the plaintiff, as stated in its certificate of incorporation are:

"The investigating, ascertaining and keeping of a record of the pedigree of horses, and of instituting, maintaining, controlling and publishing a *Stud Book* or Book of Registry of horses in the United States of America and Canada; and of promoting and holding exhibitions of such horses *and generally for the purpose of improving the breed thereof.*"

The impetus for the formation of the plaintiff was furnished by the owners and breeders of thoroughbred race horses in the United States. In 1893 a group of them adopted a resolution proposing the formation of a Jockey Club of 50 members to encourage the development of the thoroughbred horse and to establish racing on a footing commanding public confidence and interest. They contemplated that the organization would establish a firm authority over all racing which might come within its control, punish offenders against accepted racing rules, protect the interest of the public in racing, and dispense justice in respect to all questions pertaining to racing which might affect the welfare of the as-

sociations racing under the rules of the proposed organization.

The organization was formed and has carried out its projected purposes, as our detailed findings show. Its Registration Department maintains and publishes the American Stud Book, in which breeders can learn the blood lines of every thoroughbred registered in the United States. Strict proof of eligibility to be registered in the Stud Book is required. More than 8,000 foals are now registered each year. The book is indispensable to the breeding and racing of thoroughbred horses in the United States.

The plaintiff publishes monthly the Racing Calendar which gives information about the names of horses, assumed names, partnerships, arrangements for the leasing of horses, jockey contracts, and registered colors. It conducts, without charge, a school for training and improving the quality of officials who supervise race meetings throughout the United States.

The plaintiff has adopted and promulgated rules of racing, which are accepted as the basic rules, and have been adopted wherever racing is conducted. They are designed to insure orderly racing, to prevent participation in racing by persons of questionable character and to eliminate deception and confusion. They deal with every feature of the arrangements necessary for the conduct of racing.

The plaintiff investigates the behavior of jockeys, keeps records of rulings against them for careless and fraudulent practices and other misconduct and, if necessary, takes disciplinary action against them and against owners and trainers. During the tax years here in question, the plaintiff passed upon applications of owners, trainers and jockeys for licenses, investigating their character and responsibility, and in proper instances, took disciplinary action against them. Such disciplinary measures taken by the plaintiff were recognized by all jurisdictions where racing takes place, both in the United States and abroad. The plaintiff's records are consulted by racing authorities throughout the United States.

The statutes of the State of New York provide that one of the three stewards required for each racing meet shall be appointed by the plaintiff, and empower the plaintiff to license owners, trainers and jockeys in that State and to revoke such licenses for cause.

The plaintiff's by-laws provide for a membership of 50 persons, each of whom shall be interested in the breeding and racing of thoroughbred horses. Membership is not transferable. In the years in question, 35 or 36 of the members owned breeding farms, and, all, with possibly one exception, owned or raced thoroughbred horses. The plaintiff's affairs are managed by nine stewards, elected for two-year terms. They receive no compensation. It has the usual corporate officers of whom only the Executive Secretary receives a salary. He is not a steward or a member of the plaintiff. There are some 22 employees.

The plaintiff has a rented office in New York City and a breeding farm at Avon, New York. It has no club house, restaurant, bar or other facilities for entertainment. Stallions, some of which belong to members of the plaintiff, are kept at the breeding farm. Nominal stallion fees are charged but the farm does not make a profit.

The plaintiff's income is derived from initiation fees of $200, and annual dues of $200 from each member, stallion fees, registration and license fees, proceeds from the sale of the American Stud Book and Racing Calendar, and compensation paid by five New York race tracks and one race track in Delaware for the supervision of race meetings. In each of four of the five years here in question the plaintiff had a net income of more than $60,000. Its surplus, which had been accumulated since 1894, was $730,243.78 at the end of 1950. Except for some payments to charities, its income is used, or held, for its corporate purposes. It has in contemplation new activities within

its corporate field which would require large expenditures.

█ The plaintiff claims that it is a "business league", within the meaning of Section 101(7) of the Internal Revenue Code of 1939, which we have quoted above, and that its income is exempted from taxation by that statute. The statute does not define business leagues, but an indication of what Congress intended by the expression may be gathered from the fact that they are named along with chambers of commerce, real estate boards, or boards of trade. Section 29.-101(7)–1 of Regulations 111 (26 C.F.R.), promulgated by the Commissioner of Internal Revenue says:

> "A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. * * * *"

The plaintiff offers no objection to the regulation but insists that it fits the definition. We think the plaintiff is "an association of persons having some common business interest, the purpose of which is to promote such common interest * * *." But we think the plaintiff does not comply with the regulation as a whole, because (1) it engages in a regular business of a kind ordinarily carried on for profit and (2) because one of its principal activities and sources of income is "the performance of particular services for individual persons."

The publication of the Stud Book and the Racing Calendar are activities of a sort which, if the plaintiff did not cover the field, would quite certainly be undertaken by some one as a business activity with a view to making a profit. The breeding and racing of thoroughbred horses is, no doubt to a considerable degree due to the plaintiff's activities and its integrity, big business. Publications carefully prepared, and necessary or interesting to those engaged in the business would sell, just as do the innumerable trade publications presently on the market.

The services which the plaintiff performs for individual persons, other than "racing commissions" and the fees charged therefor, are shown in finding 48. Each of these services is, by the tradition of the industry or even by law, essential to the individual who requests and pays for the services. They are comparable to a lawyer's certificate of title, or a doctor's certificate of health. The "racing commissions" charges of $300 per day, which the plaintiff received from five tracks in New York and one in Delaware, were for services described in the contracts as follows:

> "Because of your long experience, your records and your means of preventing frauds and other acts detrimental to the best interests of racing, we desire to retain you to advise us in respect to the conduct of our 1951 race meeting, and particularly to assist us in safeguarding our race meeting and facilities against anything which would be harmful or detrimental to racing."

█ These services were bought and paid for by the tracks so that the races would be orderly and reputable, and spectators and bettors would continue to patronize them, to the profit of the owners of the tracks, the horses, and the betting concessions. We think that these services sold to particular enterprises, which sales produced practically all of the plaintiff's large income, disqualify it for the tax exemption granted by Section 101(7) of the regulations. Its petition will, therefore, be dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.