MIB, Inc., Petitioner v. Commissioner of Internal Revenue, Respondent

Docket No. 5297–81.    Filed February 22, 1983.

*Robert H. Kapp, Arthur J. Rothkopf, Ronald E. Stauffer, Neil M. Day* (an officer), *James S. Corbett* (an officer), and *Eugene M. Thore*, for the petitioner.
*David N. Brodsky*, for the respondent.

Whitaker, *Judge*: Respondent determined a deficiency of $1,528,055.42 in petitioner's Federal income tax for its taxable year ended September 30, 1979, based on his determination that petitioner was not entitled to exemption under sections 501(a)[1] and 501(c)(6). He also determined an addition to the tax of $382,013.96 because petitioner's Federal income tax return (Form 1120) for the 1979 taxable year was not filed until September 9, 1980. Respondent has stipulated that petitioner is not liable for this addition to the tax; thus, the sole issue for decision is whether petitioner is entitled to exemption from Federal income taxation as a business league described in section 501(c)(6).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. It has been stipulated that petitioner had its principal place

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended.

of business in Westwood, Mass., when it filed the petition in this case.

## *Life Insurance Underwriting*

The essence of insurance is the transfer of risk from an individual or business enterprise to a corporation or cooperative society that is in the business of assuming the risks of others for an appropriate consideration called a premium. In determining the premium it charges for a life insurance policy, a life insurance company first determines the amount of money per unit of coverage that it needs to have on hand at the beginning of the contract to pay all benefits under the contract. This amount is then converted into an actuarially equivalent series of annual premiums. The annual premium is then "loaded" by an amount deemed sufficient to cover all expenses associated with a unit of that form of insurance and provide a reasonable return or contribution to surplus.

To determine a fair and equitable price for life insurance coverage, applicants must be grouped into classes according to their expected risk of loss so that everyone in the same classification has approximately the same risk of loss and is purchasing protection having approximately the same unit value as that sold to others in that class. The premium for each risk class must not only be adequate for that class, but must also bear an appropriate relationship to the premium for every other class in order properly to apportion the overall burden of claims and expenses. Thus, an applicant who is determined to be a substandard risk is charged an extra premium based upon the amount by which his risk rating exceeds the standard rating of 100. If his rating is high enough, he will be denied insurance altogether.

The dominant characteristic for risk classification of a life insurance applicant is his or her age, with other factors such as gender, physical condition, and occupation serving to further differentiate the risk characteristics of individuals in different risk classifications. The applicant's medical record, especially the portion relating to consultation, treatment, or hospitalization within the last 5 years, provides the most relevant body of information considered by a life insurance company in the underwriting process. In many cases, the medical record provides the first clue to a physical malfunc-

tioning that is life-shortening or possibly even life-threatening, a factor which would dramatically affect the applicant's risk classification.

The application form is the primary source of information used by a life insurance company in deciding what risk classification to assign to an individual. Because of the importance of the applicant's medical record, most of the questions in the application are designed to elicit information about the past and present state of the applicant's health. The application form is also the principal means through which insurance companies learn the identity of sources of medical record information, such as the applicant's personal physician and hospitals or clinics where the applicant has received treatment.

If an individual applies for a significant amount of insurance or if circumstances suggest the need for further investigation, a life insurance company may request an inspection report from a consumer investigative agency, which may question the applicant and his employer, business associates, neighbors, and others concerning the applicant's habits, character, financial condition, occupation, home and business life and factors bearing upon health condition. Some companies use the services of independent agencies that employ inspectors to make these and similar reports. Other companies use their own employees to perform this function in-house. Both independent agency inspections and in-house inspections are commonly conducted by means of telephone interviews.

If an applicant has been under recent medical treatment or has been hospitalized within the last few years, the insurance company may seek medical details and a prognosis from the physician, hospital, or other organization that provided treatment. Depending upon the amount of insurance applied for, or if the applicant's medical history suggests the advisability of more information, the insurer may require the applicant to undergo a medical examination.

Even though medical examinations and investigative reports can be used to verify some of the information elicited in the application forms, they are not undertaken with respect to a large percentage of applications because the insurance company must bear their cost. Moreover, the medical examination is not a foolproof safeguard against the omission or

concealment of an adverse medical history or health condition since the applicant may go to considerable effort to appear at his or her best during the medical examination through rest, diet, or medication, and thereby prevent detection of a current medical condition. Similarly, adverse factors bearing on an individual's health condition may well not be detected in making investigative reports.

The integrity of the risk selection and classification process in connection with individual life insurance is dependent upon the insurance underwriter's having access to all information that would have a material bearing on the expected mortality or longevity of the applicant. If the applicant successfully misrepresents or conceals information that would have affected adversely the underwriting decision, he will be placed in a risk classification the premium structure for which assumes a lower level of mortality than that which can be expected for a group of insureds with risk characteristics similar to those of the misclassified applicant. The applicant may even be accepted when the proper underwriting decision would have been rejection. The effect of a sustained series of distorted underwriting decisions is higher than expected mortality across all risk classifications, which results in higher net costs to policyholders generally. If misclassification occurs on a broad enough basis and over a long enough period, the solvency of the insurance fund can be jeopardized since loss experience will be worse than expected, premiums will increase, and the lower risk and disadvantaged members of the pool will tend to withdraw and seek coverage elsewhere on more equitable terms. This distortion in the pricing structure will cause the insurance company's profits to decline, and if it is pervasive and goes uncorrected, the insurance enterprise will ultimately collapse because of excessive losses.

The potential for fraud and misrepresentation in connection with life insurance applications threatens the financial soundness of all life insurance companies. Because this problem is industrywide and can be effectively combated only by a cooperative effort, all life insurance companies share a common interest in reducing the incidence of fraud and misrepresentation in the application process. The deterrence of fraud with respect to life insurance is also a State interest since State insurance commissions have regulatory responsibilities

to assure that insurance costs are shared equitably among policyholders. Furthermore, several States have statutory provisions prohibiting fraudulent insurance claims.

## Petitioner's Role in the Insurance Industry

Petitioner is an association of life insurance companies, designed primarily to respond to the industry's pressing need to minimize the occurrence of fraud and misrepresentation in the application process. This goal of fraud deterrence is accomplished by its operation of a system for the exchange of confidential underwriting information, principally medical record information, among member companies. Membership in petitioner is open to any insurance company in the United States or Canada conducting the business of life insurance on the legal reserve plan which (1) is duly licensed by and in good standing with the insurance supervisory official of the jurisdiction of its domicile and wherever else it does business; (2) has its medical affairs administered by a medical director who is a qualified physician; (3) pledges to comply with the rules and regulations of petitioner; and (4) agrees upon termination of membership to follow petitioner's directions in disposing of any property or information it received through or because of its membership in petitioner.

During its fiscal year ended September 30, 1979, petitioner's membership consisted of 732 insurance companies, which together represent more than 98 percent of the legal reserve life insurance business in the United States.[2] U.S. legal reserve life insurance companies that were not members of petitioner were all very small, with many of them being companies that substitute group selection methods for individual selection and consequently are not concerned with the health habits or other factors bearing on the insurability of any particular individual within the group. For instance, many of these nonmember companies are captive insurance companies owned by banks, small loan companies, and other consumer credit institutions that issue group term insurance covering the lives of individuals who are indebted to their parent

---

[2]Companies that are members of petitioner collectively write more than 98 percent of the life insurance in force in the United States and also hold more than 98 percent of the assets of U.S. life insurance companies.

organizations, or insurance companies that write group term insurance for multiple employer trusts. Others are companies that write burial insurance policies, which ordinarily do not exceed $1,000 to $2,000 in face amount, or that offer mail-order insurance which does not rely on individual underwriting.

Petitioner maintains a data bank of information that may be used in verifying information elicited from an applicant. Petitioner does not employ investigators, examine applicants, use consumer reporting agencies, or review public records, but relies on its members as its sole source of data. Petitioner's rules and regulations require members to submit, at their expense, coded reports of certain types of information furnished by applicants for life insurance. Well over 90 percent of the information reported to petitioner consists of "medical impairments," which are, in essence, known characteristics of the subject individual's health or medical history. There are 228 categories of coded medical impairments that may be reported. Some of these codes relate to general medical history information that may not in itself indicate any current medical problem. For example, an entry is required if a member company learns that an individual has had a significant X-ray which was favorable and taken simply as a routine measure. Other codes record an individual's particular medical problems and treatment. For example, if a member company learns that an individual has had high blood pressure, which was being treated by the use of drugs, this fact must be recorded in petitioner's data bank through the submission of coded entries. To be reportable, medical impairment information must have been obtained by the reporting company from either the applicant, himself, or with the applicant's consent, a "medical source" (i.e., a licensed physician, a medical practitioner, a hospital, a clinic, or other medical or medically related facility).

Members also submit coded reports of several categories of nonmedical information, including the applicant's date and place of birth, records of reckless driving confirmed by the applicant or by official motor vehicle bureau reports, recent aviation activity or hazardous sports activity, confirmed records or reports of recent criminal activity, and records of alcohol or drug abuse confirmed by the applicant or by arrest

or conviction records. The reports do not list the amount of life insurance applied for but do state whether the applicant has previously applied for a life insurance policy with a face amount in excess of $250,000. Members do not report their underwriting and claims decisions or information received in connection with life, health, or disability insurance claims. Moreover, they do not provide complete medical histories on applicants but only the specific medical impairment and nonmedical information delineated in the guidelines. About 20 percent of all insurance applications involve impairments or other information that must be reported to petitioner.

In processing an individual's application for life insurance, a member company will routinely request petitioner to provide data relating to the applicant. After securing the applicant's written consent to use petitioner as an information source, the member company submits an inquiry, either by mail or telecommunications, to petitioner's computerized data file in Boston, Mass., and is provided with essentially the contents of the coded reports submitted by one or more reporting member companies. The identity of the reporting companies, however, is not revealed to the requesting company.

By comparing the report from petitioner with the applicant's answers to questions in the insurance application, the company may be alerted to aspects of the application that are incomplete or misleading. In this way, the reports help the company decide whether further investigation of the applicant's insurability is needed or whether an underwriting decision should be made on the basis of the information the company already possesses. If, after having received the report from petitioner and having conducted its own investigation, a member is unable to obtain details pertaining to facts contained in the report, it may ask petitioner to notify the reporting company of the requesting member's desire to obtain details. Requests for details are submitted by member companies in connection with only about 0.2 percent of the requests for information processed by petitioner. In submitting a request for details, the requesting member must certify either that (1) a medical examination of the applicant has been completed, (2) a statement has been obtained from a medical source, or (3) in the case of nonmedical coded information, an investigation of the subject matter has been completed

through relevant sources. Upon satisfaction of these conditions, petitioner will forward the request for details to the company which furnished the coded information. The reporting member is not required to furnish details of its report, or to disclose its identity, to the requesting member, but rather has total discretion as to the amount and content of information, if any, that it chooses to furnish to the requesting member in response to a request for details.

Rarely will petitioner's reports contain sufficient information upon which underwriting decisions can be made. Petitioner's rules provide that a member company may not use the reports as the basis for establishing an applicant's insurability and must establish insurability by conducting its own independent investigations. The only time a member company is permitted to use information supplied by petitioner for underwriting purposes is when it can certify that further investigation is not needed to assure that the information received relates to the correct person and that it obtained from the reporting member either the documents that were the basis of the latter's report to petitioner or advice from the reporting company that the information was verified from a medical source or the applicant.

By providing member companies with an "alert" as to possible omissions or misstatements on application forms, petitioner's information exchange helps members to detect omissions and misstatements in life insurance applications. Moreover, because applicants and agents know petitioner's information exchange is used in processing applications, it works as a powerful deterrent to fraud and misrepresentation. Each applicant is informed in writing, as part of the application process, about petitioner's information exchange and must expressly authorize the insurance company to which the application is made to request information from petitioner concerning the applicant. Applicants are thus made aware that information obtained by another insurance company in connection with a prior application for insurance may be made available to the insurance company to which the current application is being made. Because of the companies' routine use of petitioner's reports to detect omissions and misrepresentations, insurance agents and brokers are motivated to encour-

age applicants to disclose, fully, medical impairments and other relevant information.

The effect of fraud deterrence is felt on an industrywide basis and enables member companies to accept the completeness and accuracy of information disclosed on application forms. This achieves significant cost savings for member companies since accurate information about an applicant enables the insurer to more accurately select and classify insurance risks. The cost savings are passed on, at least in part, to policyholders, thus making them indirect beneficiaries of petitioner's operations.

Under petitioner's rules and regulations, the confidentiality of impairment information is protected. All personal information received, stored, or transmitted by petitioner is in coded form. Members are allowed to use information from petitioner solely for personal life and health underwriting and claims purposes, and they must institute internal procedures to prevent dissemination of information to nonmembers, unauthorized personnel, consumer reporting agencies, and any other individual or corporation. The accuracy of information is enhanced by the requirement of petitioner's that a reporting member cancel, correct, or supplement information it reported if it subsequently discovers that the information was inaccurate or incomplete. Also, petitioner must immediately be notified if any member, after investigation, has reason to believe that a report received from petitioner contains inaccurate or incomplete information. All coded information is automatically deleted from the data bank 7 years after entry. Petitioner's rules also provide for the disclosure of information in its files to the subject of the information and his or her physician upon request, and they include procedures to be used by any person disputing the accuracy of information in a report pertaining to him or her.

## Petitioner's Organization and Operation

The origin of the petitioner can be traced back to at least as early as 1890, when a group of domestic life insurance medical directors formed the "Rejection Exchange" for the exchange of medical and other information of underwriting significance. In 1902, the functions of the "Rejection Exchange" were taken over by the Association of Life Insurance Medical Directors of

America, a professional organization of medical directors, which thereafter conducted the exchange under the name "Medical Information Bureau" (bureau). In 1947, the bureau was reorganized as a separate, unincorporated nonprofit association.[3] On May 10, 1978, petitioner was organized under Delaware law as a nonprofit, membership corporation, and on May 25, 1978, succeeded to the bureau's functions and assumed all its assets and liabilities. On or about July 3, 1978, petitioner filed with respondent a Form 1024, Application for Recognition of Exemption Under Section 501(a), seeking recognition of tax exemption as a business league under section 501(c)(6). By letter dated April 17, 1980, respondent advised petitioner that its application for exemption had been denied.

Petitioner is the only organization in the United States that operates an information exchange service to collect, maintain, and disseminate medical record and related impairment information for the life insurance industry. There are no commercial enterprises that engage in the same activity as petitioner, and there is no need for the creation of a second exchange similar to that operated by petitioner since petitioner effectively serves the industry's needs.

The affairs of petitioner are managed by a board of directors, which has the power to promulgate rules and regulations governing the exchange of information through petitioner, and to fix membership dues, charges, and assessments. During the fiscal year ended September 30, 1979, the board of directors consisted of nine directors elected by the members. Each of the directors must be an officer of a different member company; four of the nine must be medical officers; and one must be a senior legal officer.

In addition to its operation of the impairment information exchange, petitioner operates the Center for Medico-Actuarial Statistics (hereinafter center), which has been operated continuously by petitioner or its predecessor since the center was established in 1972. The center assists in mortality and morbidity studies, the results of which are made available to, and provide substantial benefits to, the insurance industry,

---

[3]In 1948, the bureau was issued a ruling by the Internal Revenue Service that it qualified for exemption under the predecessor of sec. 501(c)(6).

the medical profession, and the general public. During 1979, out of petitioner's approximately 250 employees, only 5 full-time and 2 part-time employees were employees of the center, while 210 clerical and data processing employees worked directly on the information exchange.

Prior to June 30, 1978, Recording & Statistical (a division of Sperry Rand Corp.) or its predecessor corporation acted as servicing agent for petitioner's predecessor, and for petitioner from May 26, 1978, through June 30, 1978, in administering the information exchange. During this period, the assessments and schedule of charges were set by petitioner's predecessor, but members paid Recording & Statistical, which then accounted to petitioner's predecessor. As of July 1, 1978, petitioner began administering the information exchange itself.

### Petitioner's Revenues

Except for interest and certain unrelated business income, petitioner's revenues are derived entirely from assessments and charges against member insurance companies. The amount of the assessments and the schedule of charges are fixed annually by the board of directors. The types of assessments and charges are as follows:

*Basic assessment.*—Each member is assessed annually for its pro rata share of the expense of editing, correlating, and data entry of all information reports from member companies, and of computer processing required in maintaining the master data file. The amount of basic assessment is based upon the size of the member company. It is computed for each member company by calculating the sum of half of the ordinary insurance written by the company during a recent preceding year, and by then applying a declining charge per million dollars.

*Checking service charge.*—Petitioner imposes a charge on member companies based upon the number and types of inquiries (regular, plan F, rush response, extended search, request for details) made by a company.

*Assessment for Center for Medico-Actuarial Statistics.*—Each member is assessed an additional amount annually, expressed

as a percentage of the basic assessment, to support the activities of the center.

*Greenwich division assessment* (formerly executive committee assessment).—Petitioner imposes an assessment to support its executive and administrative operations. This assessment is based entirely upon the size of the member company and may run from $200 to $5,000.

The board of directors of petitioner and its predecessor has followed the practice of limiting annual assessments and charges to member companies to that level sufficient to cover projected operating expenses and capital expenditures approved by the board and to provide a contingency reserve. For the fiscal year ended September 30, 1979, petitioner realized revenues as follows:

| | |
|---|---:|
| Basic assessment | $4,984,282 |
| Checking service charge | 5,300,537 |
| Assessment for Center for Medico-Actuarial Statistics | 149,526 |
| Greenwich division assessment | 827,301 |
| Interest income | 309,228 |
| Miscellaneous income | 12,480 |
| Unrelated business income | 1,375,996 |
| Total | 12,959,350 |

The unrelated business income consisted of fees received for (1) making excess computer capacity available to member companies to assist them in automating their policyholder index files, and (2) fulfilling the remaining term of certain third-party service contracts of Recording & Statistical, which petitioner assumed as a condition of the termination of its agreement with Recording & Statistical.

The revenue of petitioner and its predecessor for each of the fiscal years 1974 through 1978 was as shown in the table on page 450.

### Credit Reporting Industry

The credit reporting industry in the United States is made up of a large number of firms, with approximately 1,800 credit bureaus and credit reporting enterprises belonging to Associated Credit Bureaus, Inc., the national trade association for the credit reporting industry, as of March 1, 1982. Approximately 25 percent of the firms in the industry are organized as

## MIB, INC., AND ITS PREDECESSOR

### Summary of Revenues by Class for the Fiscal Years Ended September 30, 1974 through 1978

| *Revenues* | *1974* | *1975* | *1976* | *1977* | *1978* |
|---|---|---|---|---|---|
| Basic assessment | $3,574,918 | $4,228,292 | $4,570,585 | $4,656,126 | $4,828,964 |
| Checking service charge | 3,927,004 | 4,434,917 | 5,224,748 | 4,979,556 | 5,159,284 |
| Assessment for Center for Medico-Actuarial Statistics | 106,327 | 121,769 | 133,246 | 138,936 | 144,323 |
| Executive committee and Greenwich division assessment | 283,679 | 642,788 | 616,239 | 708,218 | [1]890,544 |
| Interest income | 31,905 | 986 | 10,126 | 44,422 | 87,766 |
| Unrelated business income | --- | --- | --- | --- | 311,267 |
| Total | 7,923,833 | 9,428,752 | 10,554,944 | 10,527,258 | 11,422,148 |

[1] When MIB incorporated, it changed from a cash basis to an accrual basis. 1978 assessment income includes $117,199 which was earned but not received as of 9/30/'78. Actual assessment income received for fiscal 1978 was $773,345.

not-for-profit corporations by merchant groups, chambers of commerce, and similar organizations. The remaining firms are operated for profit, and in some cases these firms are owned by large, publicly held corporations.

## ULTIMATE FINDINGS OF FACT

Petitioner is not engaged in a regular business of a kind ordinarily conducted for profit since there exists, actually or prospectively, no profit-oriented business operating a system for the industrywide exchange among life insurance companies of medical and other confidential information relating to life insurance applicants.

Although petitioner's members benefit by using its information exchange services, the benefit to particular companies is only incidental to the achievement of the general industrywide purpose of detecting and deterring fraud and misrepresentation by life insurance applicants. Thus, petitioner's activities are directed toward the improvement of business conditions in a single line of business and do not constitute the performance of particular services for individual persons.

## OPINION

Organizations described in section 501(c)(6) which are exempt from taxation under section 501(a) include "Business leagues, * * * not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual." The statute does not define the term "business league" and this term has no well-defined meaning or common usage outside of the perimeters of section 501(c)(6). However, section 1.501(c)(6)–1, Income Tax Regs., sets forth the following definition of business league:

A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. * * *

This regulation has been upheld as a valid implementation of the congressional purpose behind section 501(c)(6). *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472 (1979); *Associated Barbers & Beauticians v. Commissioner*, 69 T.C. 53, 62 (1977).

Under these regulations, an organization must satisfy the following six requirements to be exempt under section 501(c)(6):

(1) It must be an association of persons having a common business interest.

(2) Its purpose must be to promote that common business interest.

(3) It must not be organized for profit.

(4) It should not be engaged in a regular business of a kind ordinarily conducted for a profit.

(5) Its activities should be directed toward the improvement of business conditions of one or more lines of business as opposed to the performance of particular services for individual persons.

(6) Its net earnings, if any, must not inure to the benefit of any private shareholder or individual.

*Associated Barbers & Beauticians v. Commissioner, supra* at 63; *American Automobile Association v. Commissioner*, 19 T.C. 1146, 1158 (1953). Respondent claims petitioner fails to satisfy the fourth and fifth requirements, i.e., that it is primarily engaged in a regular business of a kind ordinarily conducted for profit, and that its primary activity is the performance of particular services for individual persons.

### Was Petitioner Engaged in a Business of the Type Ordinarily Conducted for Profit?

Petitioner's primary activity (although not its rationale for existence) is the operation of a system for the collection, storage, and dissemination of confidential information concerning life insurance applicants. This information is useful to life insurance companies in the process of deciding whether to issue and how to underwrite individual life insurance policies. The parties agree that petitioner is the only organization in the United States that operates a system for the exchange among life insurance companies of medical record and related

impairment information. Nevertheless, respondent sees petitioner as the type of business ordinarily conducted for profit. He characterizes petitioner's primary activity as the furnishing of information to be used by life insurance companies for underwriting purposes, a service provided in general by the insurance companies.

The mere fact that information exchanged through petitioner may cause an investigation to be made during the underwriting process should not lead us to accept this view. Petitioner's operations differ substantially from those of investigative companies and of life insurance companies, themselves. Petitioner does not provide any investigative service and receives information only from its own members. It is simply a conduit for an industrywide cooperative exchange of confidential information, a function not even attempted by any other organization, on either a profit or nonprofit basis. Moreover, the information provided by petitioner is quite limited, and member companies are specifically prohibited from basing their underwriting decisions on information forwarded by petitioner. Therefore, we do not accept respondent's view that petitioner is actively competing with certain activities of life insurance companies and commercial investigative companies.

In deciding whether an association is engaged in the kind of business ordinarily conducted for profit, the case law has generally focused on the existence of competing profit-oriented businesses. In cases where there have been commercial businesses actually carrying on the same types of activities, courts have denied exemptions under section 501(c)(6). For example, in *Underwriters' Laboratories, Inc. v. Commissioner*, 135 F.2d 371, 374 (7th Cir. 1943), affg. 46 B.T.A. 464 (1942), the court held that the operation of a laboratory for scientifically testing manufacturers' products was a regular business of a kind ordinarily carried on for profit since many manufacturing concerns operated testing laboratories in conjunction with, and as a part of, their normal business enterprise. See also *Associated Barbers & Beauticians v. Commissioner, supra* (by sponsoring and administering both a self-insurance plan and a plan underwritten by a commercial insurance company, an association was engaging in the insurance business); *American Automobile Association v. Commissioner, supra* (association

that provided motoring and touring services competed with existing commercial businesses). Where there have been no comparable profit-oriented businesses, the cases have held associations not to have violated this requirement. For example, in *Evanston-North Shore Board of Realtors v. United States*, 162 Ct. Cl. 682, 320 F.2d 375, 377 (1963), the court found that a real estate multiple listing system was not a business ordinarily conducted for profit because all the other multiple listing systems in the country, more than 100 in number, were also operated on a nonprofit basis. See also *Crooks v. Kansas City Hay Dealers' Association*, 37 F.2d 83 (8th Cir. 1929) (association of hay dealers that employed persons to inspect, weigh, and watch cars of hay that were bought, sold, or consigned by or to association members in return for fees from shippers did not compete with any business since there was no other business in Kansas City furnishing similar services); and *Oregon Casualty Association v. Commissioner*, 37 B.T.A. 340, 345 (1938) (association of casualty insurance companies that checked insurance policy rates to assure compliance with State-approved rate schedules was not in a regular business of a kind ordinarily carried on for profit since the only organizations performing similar services were also nonprofit organizations).

Respondent argues that the absence of actual competition to petitioner should not be determinative. To support this position, he relies primarily upon *Jockey Club v. United States*, 133 Ct. Cl. 787, 137 F. Supp. 419 (1956), which involved an organization that had been formed to develop thoroughbred racing in the United States and that engaged in a wide range of activities including the publication of the American Stud Book, listing the bloodlines of thoroughbred horses registered in the United States, and the Racing Calendar, giving information about the names of horses, jockey contracts, etc. The court denied exemption under the predecessor to section 501(c)(6), in part because it found that the publication of these materials was an activity that would quite certainly have been undertaken by someone as a profit-oriented business activity if the Jockey Club had not already "covered the field." Respondent contends this establishes that we must consider potential as well as actual competition.

We agree that reasonably foreseeable competition from

existing businesses should be considered. But we do not believe a finding that an organization is conducting the type of business ordinarily conducted for profit should be based upon mere speculation that someone might possibly try to undertake the activity for profit if the organization ceased to do it. The type of activity involved in the *Jockey Club* case—the publishing of primarily statistical information for sale to the public—is the type of activity many existing publishers were readily equipped to handle.[4] Here, by contrast, petitioner did not sell its reports to nonmembers; it simply provided a cooperative service for its own members. We have no basis for concluding that a for-profit business would or could perform a function similar to petitioner's information exchange if petitioner ceased its operations.

Respondent claims petitioner is similar to a retail credit bureau and cites four cases denying section 501(c)(6) exemptions to such organizations. *Apartment Operators Association v. Commissioner*, 46 B.T.A. 229 (1942), affd. sub nom. *Apartment Operations Association v. Commissioner*, 136 F.2d 435 (9th Cir. 1943); *Retailers Credit Association of Alameda County v. Commissioner*, 33 B.T.A. 1166 (1936), affd. 90 F.2d 47 (9th Cir. 1937); *Credit Bureau of Greater New York, Inc. v. Commissioner*, a Memorandum Opinion of this Court dated September 25, 1946, affd. 162 F.2d 7 (2d Cir. 1947); *Credit Managers Ass'n of Northern & Central California v. Commissioner*, a Memorandum Opinion of this Court dated April 21, 1944, affd. 148 F.2d 41 (9th Cir. 1945). Certainly, retail credit bureaus bear some resemblance to petitioner in that they collect and store information concerning particular persons, which is retrieved by members when considering doing business with those persons. However, long before these cited credit bureau cases were decided, it had been well established that the furnishing of credit information was the type of activity ordinarily carried on for profit, thus depriving credit bureaus of exempt status. See, e.g., *Northwestern Jobbers' Credit Bureau v. Commissioner*, 37 F.2d 880 (8th Cir. 1930).

---

[4]*Jockey Club v. United States*, 133 Ct. Cl. 787, 137 F. Supp. 419 (1956), should be compared with *National Leather & Shoe Finders Association v. Commissioner*, 9 T.C. 121, 126 (1947), in which we found that an organization was not engaged in a regular business of a kind ordinarily carried on for profit when it published a trade magazine of an educational nature and circulated it free of charge to nonmembers.

Furthermore, it has been stipulated in this case that approximately 75 percent of all credit reporting firms are operated for profit and compete with the approximately 25 percent of the industry organized on a not-for-profit basis. This existence of actual commercial competition in the credit-reporting industry clearly renders the cases cited by respondent inapposite here, since no business organized for profit has ever undertaken an information exchange operation like that of petitioner. Another factor distinguishing the operations of credit bureaus from those of petitioner is that most credit bureaus receive information for their data banks not only from their members but from a wide variety of sources, including their own investigations and review of public records. Here, the only source of data stored by petitioner was its member companies, who were also the only businesses that could retrieve the data from petitioner.

Because petitioner has no actual or reasonably foreseeable commercial competitors, we find it was not engaged in the type of business ordinarily conducted for profit.

### Did Petitioner's Activities Constitute the Performance of Particular Services for Individual Persons?

Respondent claims that the information exchange constitutes the performance of particular services for individual persons since it enables member companies to reduce their underwriting and operating costs. Petitioner argues that the benefits to individual members are merely incidental to its purpose to improve business conditions in the life insurance industry, generally, by detecting and deterring fraud in connection with life insurance applications. Thus, each party focuses upon a different aspect of petitioner's activities. We must determine which constitutes the primary activity, making sure that "the tail does not wag the dog." For the reasons set forth, we agree with petitioners.

Much of petitioner's argument focuses on how the public at large may benefit from petitioner's activities. Petitioner points out that the reduction in the incidence of fraud due to its operation of the information exchange contributes to the fairness and quality of the risk selection and classification process, thereby reducing the incidence of misclassification and the resulting threat to the life insurance industry's

financial soundness. In *Oregon Casualty Association v. Commissioner, supra,* we found that the association, whose function was to check whether insurance policy rates complied with the rate schedules fixed by law, not only benefited the insurance companies but served a substantial public interest since the prevention of cutthroat competition with respect to insurance rates assured the public that insurance companies would have a sound actuarial basis. In the case before us, petitioner's information exchange serves not only the interests of its member companies but also the public interest since States have a recognized interest in reducing insurance fraud and assuring that insurance costs are shared equitably among policyholders. To the extent petitioner's activities benefit the public, they should be seen as group, not individual, benefits.

Respondent claims that the benefit to the public is outweighed by the benefit to petitioner's members. But even when an activity does not foster a public benefit, it may still benefit the industry, generally, rather than individual members. See *Associated Industries of Cleveland v. Commissioner,* 7 T.C. 1449, 1466–1467 (1946); *Washington State Apples, Inc. v. Commissioner,* 46 B.T.A. 64, 69 (1942). Like many of the previous section 501(c)(6) cases addressed by the courts, this case involves activities that benefit the industry, generally, but also convey tangible benefits upon the individual businesses within the industry. As we pointed out in *National Leather & Shoe Finders Association v. Commissioner,* 9 T.C. 121, 126 (1947), "it can hardly be supposed that individuals would often join organizations without the expectation of receiving some personal benefits therefrom." Thus, the question we must answer is whether the individual benefits are only incidental or subordinate to the organization's purpose to benefit the entire line of business. *Crooks v. Kansas City Hay Dealers' Association,* 37 F.2d 83, 85 (8th Cir. 1929); *National Leather & Shoe Finders Association v. Commissioner, supra* at 126.

In examining whether petitioner's activities primarily benefit individual persons or are designed to improve business conditions, generally, it is important to keep in mind that

virtually the entire life insurance industry belongs to petitioner and participates in its information exchange.[5] This means that almost every application for insurance results in a request to petitioner. However, only 0.2 percent of members' requests for information from petitioner are followed up by requests for details from the companies that initially supplied the information to petitioner. Presumably, in the other 99.8 percent of the cases, information supplied by petitioner corroborates or does not conflict with information already furnished in the application process, primarily through the applicants' responses to questions on the application forms. Thus, the exchange of information through petitioner rarely leads to a member company's detecting a particular instance of fraud or misrepresentation by an applicant. However, the fact that 20 percent of all applications involve impairments or other information significant enough to be reported to petitioner indicates that there is a significant potential that fraud and misrepresentation would occur if petitioner did not exist. Because applicants and agents are aware of the routine exchange of information through petitioner, fraud and misrepresentation in the application process is effectively deterred. Only through industrywide cooperation can petitioner achieve such a result. For this reason, we believe the actual use in any given case of petitioner's exchange function and the particular information received from it is secondary in importance to the purpose of developing and maintaining an industrywide information data bank designed to help improve business conditions for all the members of the industry.

It is important to keep in mind that the underwriting decision cannot be made upon the basis of the information furnished by petitioner. That is to say, that an applicant cannot be rerated or an application rejected by reason of medical impairment information supplied by petitioner. Such a decision can only be made following an investigation triggered by a report from petitioner, and this happens in an

---

[5]Since petitioner represents more than 98 percent of the legal reserve life insurance business in the United States, a benefit to its members serves the general interests of the entire industry. See *American Plywood Association v. United States,* 267 F. Supp. 830 (W.D. Wash. 1967), in which the court accepted an association whose members produced 92.7 percent of the total volume of plywood produced in the United States as representing the interests of the plywood industry generally.

insignificant percentage of the cases. It is true that in an indirect sense, a member company does act in response to petitioner's reports in that when the "alert" is not sounded, the member presumably acts on the basis of the information in its possession. This is, however, the incidental benefit necessarily flowing from the system. It is an industrywide benefit which results from the effectiveness of petitioner's system as a deterrent to fraud and misrepresentation in the application process.

The case law supports our focusing on the industrywide character of petitioner's activities. Several cases upholding business league exemptions have focused on the purpose of benefiting the industry as a whole. *Associated Industries of Cleveland v. Commissioner, supra,* involved a group of manufacturers in a geographical area that associated together to promote the "open shop" principle. We recognized that individual members of the association who were confronted with potential strikes undoubtedly profited more from the association, or at least felt that they did, than other members. However, the association's raison d'etre was not to furnish services that individual members could purchase elsewhere, but to serve the interests of the entire community of members. Since the rendering of services to individual members was part and parcel of the whole scheme of concerted actions by all the members acting through the association, we held it was entitled to exemption as a business league. In *National Leather & Shoe Finders Association v. Commissioner, supra* at 127, we found that an organization's publication of a magazine, operation of a credit information service on stores with which petitioner's members did business, occasional mailing of letters to assist members in collecting past due accounts, and acting as a clearinghouse on legislative, tax, and trade matters were all directed in the main toward accomplishing the primary purpose of improving business conditions in the leather and shoe findings industry as a whole. We characterized petitioner's primary activity as the disseminating of useful information to all its members as a group, thus evidencing the importance attached to whether the services provided by the organization are provided on a group basis rather than to only some businesses within the industry. In *American Plywood Association v. United States,* 267 F. Supp.

830 (W.D. Wash. 1967), the organization's primary purpose was the promotion and development of the use of quality plywood. While individual members clearly benefited from quality control and promotional activities carried out by the association to further this purpose, the court emphasized that the services were most immediately group benefits, with the industry as a whole being able to assure the public of quality plywood. *Washington State Apples, Inc. v. Commissioner, supra,* involved an organization representing most of the apple growers in the State of Washington. We found that institutional advertising designed to promote the sale of apples grown in Washington State should not be characterized as benefits to particular members because the purpose for forming the organization was to better the industry as a whole.

On the other hand, cases that have seen an association's activities as benefiting particular persons have usually involved services provided by the association to only some of its members or customers. For example, in *Southern Hardwood Traffic Association v. United States,* 283 F.Supp. 1013 (W.D. Tenn. 1968), affd. per curiam 411 F.2d 563 (6th Cir. 1969), the court found that the quoting of specific shipping rates, the preparation of bills of lading, the tracing and reconsigning of individual shipments, and the performance of recordkeeping functions were individual services calculated to benefit only those particular members who took advantage of such services. See also *Indiana Retail Hardware Association v. United States,* 177 Ct. Cl. 288, 366 F.2d 998 (1966) (association sold to some of its members various advertising and promotional aids, and managerial, bookkeeping, tax preparation, billing and collection services, etc., for which it was compensated by the particular members); and *Jockey Club v. United States, supra* (organization supervised particular race meetings in return for payments from the particular racetracks).[6]

---

[6]Cf., *Louisiana Credit Union League v. United States,* 501 F.Supp. 934 (E.D. La. 1980), affd. 693 F.2d 525 (5th Cir. 1982), in which the court found that an exempt business league's furnishing of data processing services to some but not all its members, who paid according to the amount of their usage of such services, was for the benefit of the individual members using the services rather than for the benefit of the credit union movement itself. The District Court noted, however, that had the league furnished the data processing services to every credit union in the State, the issue would be much closer since all the member credit unions would share jointly in the efficiency or inefficiency of the operation, and the program would arguably then be to the benefit of the entire credit union movement rather than being

Respondent contends that petitioner's information exchange is analogous to retail credit information services, which courts have viewed as performing services for individual persons. See *United States v. Oklahoma City Retailers Association*, 331 F.2d 328 (10th Cir. 1964); and *Credit Bureau of Greater New York, Inc. v. Commissioner*, a Memorandum Opinion of this Court dated September 25, 1946, affd. 162 F.2d 7 (2d Cir. 1947). These retail credit cases must be distinguished from this case because the benefits to member companies using petitioner's information exchange are much less direct than the benefits to persons using credit reporting services. Credit reports are routinely used by merchants and other businessmen as the basis for deciding whether to extend credit, while reports provided by petitioner are never used by member companies as the basis for their underwriting decisions. The main purpose for the exchange of information through petitioner was to reduce fraud and misrepresentation by applicants, who themselves provide most of the information used by the companies in making their underwriting decisions, a purpose quite different from the credit bureaus' purpose of providing new or additional information to help businesses decide on particular persons' credit ratings. This purpose of deterring fraud and misrepresentation benefits the life insurance industry as a whole. Benefits to individual member companies are incidental or subordinate to this primary purpose. See *Commissioner v. Chicago Graphic Arts Federation, Inc.*, 128 F.2d 424 (7th Cir. 1942), affg. a Memorandum Opinion of this Court.

Respondent contends that we should employ herein an analysis similar to that used by the Court of Claims in *Evanston-North Shore Board of Realtors v. United States*, 162 Ct. Cl. 682, 320 F.2d 375 (1963). The Court of Claims cited four factors in support of its conclusion that an organization's operation of a real estate multiple listing system constituted the provision of particular services to individual realtors. First, and most important, was that the fees charged for the

of primary benefit only to participants. 501 F.Supp. at 941 n. 9. See also *Carolinas Farm & Power Equipment Dealers Association v. United States*, 699 F.2d 167 (4th Cir. 1983), which applied the test used by the Fifth Circuit and found that an organization's furnishing low cost group health insurance did not benefit its members as a group since only 41 percent of the members chose to purchase insurance through the organization.

listing services were in approximate proportion to the benefits received by each realtor. Second, participation in the multiple listing system was limited to members of the association. Third, there was substantial evidence that the real estate industry viewed multiple listing systems as "nothing more than a cooperative sales department of a purely business operation." Finally, because they bring together interested buyers and sellers, the multiple listing systems are quite analogous to stock and commodity exchanges, which have been expressly denied exempt status by the regulations since 1925.

The determination of whether an organization provides particular services to individual persons or benefits the line of business, generally, must be made on the basis of the specific facts and circumstances of each case. We believe the case before us differs significantly from *Evanston-North Shore Board of Realtors v. United States, supra*, even though there are some superficial similarities. First of all, respondent concedes that the Court of Claims' analogy of multiple listing services to stock exchanges does not apply here. Furthermore, the record before the Court of Claims contained several statements showing that real estate industry officials regarded the multiple listing system as simply a "sales tool" at the disposal of individual members. One of the board's witnesses had conceded that "multiple listing services operated outside and independent of a real estate board, are in fact, nothing more than a cooperative sales department of a purely business operation." Other evidence highlighted the fact that real estate brokers participating in multiple listing services could expect to sell 30 to 45 percent of listings received, while nonparticipating brokers could expect to sell less than 1 percent of their listings. This evidence indicates that real estate brokers' participation in multiple listing services was caused by their desire to generate more sales business, which clearly conveys particular benefits, in the form of additional sales commissions, to individual brokers. Here, there is no comparable evidence to indicate that life insurance officials viewed petitioner's information exchange as merely an aid to their sales of life insurance, and it is apparent that member companies' use of petitioner did not enable them to increase sales volumes.

The arrangement for members' payment of fees to petitioner is somewhat similar to that utilized by the Board of Realtors in the *Evanston-North Shore* case in that each company must pay both a basic assessment and additional charges based upon utilization of the exchange services. Respondent would have us place controlling weight on this similarity in the fee arrangements, but in the context of this case, we do not believe the fee arrangement establishes that benefits were primarily individual in nature. First of all, for the 1979 taxable year, only slightly more than 47 percent of the assessments and fees were service charges for using the information exchange, while the remainder was based on members' size and volume of business. Certainly, members of many trade associations are charged in proportion to their size or volume of business and receive benefits generally proportionate to their payments, and this is in itself not a sufficient basis for disqualification under section 501(c)(6). Furthermore, the primary benefit life insurance companies receive from participation in petitioner is the deterrence of fraud and misrepresentation, which cannot be quantified and necessarily bears no proportional relation to the service charges.[7] The industrywide benefit was substantial in this case and cannot be ignored. Compare *Washington State Apples, Inc. v. Commissioner, supra*, in which we found that industrial advertising resulted in group rather than individual benefits even though members' payments were based on the quantity of apples shipped, with *Contracting Plumbers Cooperative Restoration Corp. v. United States*, 488 F.2d 684 (2d Cir. 1973), in which the industrywide benefit was deemed to be minimal, and all members were considered as receiving benefits precisely in proportion to their contributions.

For these reasons, we do not see the case law cited by respondent as controlling. On the basis of the record before us, considering, in particular, the purpose of petitioner to deter fraud and misrepresentation on an industrywide basis, we conclude that petitioner's activities are directed toward the improvement of business conditions in the life insurance

---

[7]Respondent suggests it is mere speculation to say that petitioner's activities had a substantial fraud deterrent effect. However, the uncontroverted testimony of several witnesses was that petitioner's information exchange was a potent, powerful, or significant deterrent to fraud and misrepresentation.

industry, generally, and do not constitute the performance of particular services for individual persons. Because we have also found that petitioner was not engaged in the kind of business ordinarily conducted for profit, we conclude that petitioner is entitled to exemption under section 501(c)(6).[8]

*Decision will be entered for the petitioner.*

___

[8]Petitioner argued in the alternative that respondent's refusal to grant it the same sec. 501(c)(6) exemption as its unincorporated predecessor had enjoyed for more than 30 years was equivalent to the revocation of an existing ruling and that respondent has the burden of establishing a rational justification for such a revocation. Because we hold for petitioner on the primary question of whether it qualifies under sec. 501(c)(6), we need not address this alternative argument.